# In the
# United States Court of Appeals
## For the Seventh Circuit
———————

No. 06-3176

JEFFREY R. PURTELL and VICKI A. PURTELL,

*Plaintiffs-Appellants,*

*v.*

BRUCE MASON, in his individual capacity,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 7005—**Amy J. St. Eve**, *Judge.*

———————

ARGUED APRIL 4, 2007—DECIDED MAY 14, 2008

———————

Before KANNE, WILLIAMS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* This free-speech lawsuit requires us to determine the present scope of the "fighting-words" doctrine. The setting is a neighborhood feud. The case features an unsightly, 38-foot recreational vehicle stored on a residential driveway in suburban Chicago, a neighborhood petition drive to force its removal, and a derogatory Halloween yard display erected in retaliation against the neighbors who led the petition drive. An unlucky police officer dispatched to mediate the dispute

was sued for his efforts, accused of violating the First and Fourth Amendments.

The plaintiffs claimed their Halloween display—wooden tombstones with epitaphs describing, in unflattering terms, the demise of their neighbors—was constitutionally protected speech. They alleged their rights under the First and Fourth Amendments were violated when the officer ordered them to remove the display on pain of arrest. The district court granted summary judgment for the officer on the Fourth Amendment claim but permitted the free-speech claim to proceed to trial. A sensible but probably misinstructed jury returned a verdict for the police officer.

We affirm. Summary judgment on the Fourth Amendment claim was properly granted. At the moment of arrest, the neighbor-combatants were engaged in a noisy argument over the tombstones, culminating in a "chest-butt." This provided probable cause to arrest for disorderly conduct. The First Amendment claim need not have been tried. The tombstone inscriptions, although insulting, cannot be considered fighting words as that doctrine is presently understood. The display was, accordingly, protected speech. But the officer's mistake about the scope of the plaintiffs' constitutional right to ridicule their neighbors was one a reasonable officer might make in this situation. He was therefore entitled to qualified immunity.

## I. Background

Jeffrey and Vicki Purtell owned a large recreational vehicle—38 feet long and 12 feet high—and for a while stored it at a rental-storage facility. In 2001, however, they

fell on hard financial times and parked it on the driveway of their home in the Village of Bloomingdale, Illinois. There it sat for more than a year. Here is a picture:



The Purtells' neighbors were unhappy but tolerated the presence of this eyesore, at least initially. Their patience eventually wore thin, however, and they complained to the Village of Bloomingdale. There was little the Village could do because the Purtells were not violating any existing laws.

Several of the neighbors then took matters into their own hands and started a petition drive urging the Village to adopt an ordinance banning homeowners from storing RVs on their property. This effort was ultimately successful. In late November 2002, the Village Board enacted an ordinance prohibiting the storage of RVs on residential property.

The Purtells eventually complied with the ordinance and moved their RV, but not before making a crude

retaliatory statement to their complaining neighbors. While the RV ordinance was still under consideration by the Village Board, the Purtells erected six wooden tombstones on their front lawn. It was mid-October and Halloween was coming, but the tombstones were not mere seasonal decorations; they carried a message for the neighbors who had pressed for the RV ordinance. Five of the six tombstones referred to a specific complaining neighbor followed by a short inscription describing the neighbor's death.

To be more specific, each tombstone was about three feet tall, and they were placed about five feet from the sidewalk, facing the street. Here is a picture of the display:



The tombstones were inscribed with epitaphs, in doggerel verse, directed at the neighbors who had petitioned for the RV ordinance. All but one referred to particular neighbors by name and specified a year of death corresponding to the

neighbor's street address, plus one additional number. For example, a tombstone referring to John Berka, who resides at 188 Jackson Lane, was inscribed as follows:

Old John Burkuh
Said he didn'T give a care
So They buried hiM
aLive uP To his hair.
He couLdn'T breath
So now we're relieved
Of ThaT NasTy oLd jerk!
~ 1888 ~

The remaining tombstones read as follows:

~ 1610 ~
Dyean was Known for Lying
So She was Fried.
Now underneath these daisies
is where she goes crazy!!
~ 1680 ~
Roses are red.
Violets are blue.
There's stiLL some space
Waiting for you!

BeTTe wAsN'T ReaDy,
BuT here she Lies
Ever since thAt night She DieD,
12 Feet deep in this trench. . .
Still wAsn'T Deep enough
For thAt wenches STench!
~ 1690 ~

Here Lies Jimmy,
The OlD Towne IDiot.
MeAn As sin even withouT his Gin.
No LonGer Does he wear
that sTupiD Old Grin. . .
Oh no, noT where
they've sent Him!
~ 1690 ~

OLd Man CrimP was a
GimP who couldn't hear.
SLiced his wife from ear To ear
She died. . .He was Fried.
Now They're TogeTher
again side by side!
~ 1720 ~

> CrysTy wAs misTy-eyed
> The DAy she DieD
> AXE to the HeAD. . .
> No DoubT She wAs DeAD.
> Now There's no more comPlain'n
> Even When iT's rain'n!
> ~ 1860 ~

These inscriptions referred to neighbors Diane Lesner, Betty Garbarz, James Garbarz, and a neighbor who owned a crimping shop. The "misty-eyed Crysty" referred to on the sixth tombstone was fictional; Jeff Purtell said he included this one to "balance out" the display.

The Purtells' neighbors were upset by the tombstone display, and several called the Bloomingdale Police Department to report that they felt intimidated by it and wanted it removed. On October 18 police officers were dispatched to the neighborhood and attempted to persuade Jeff Purtell to take down the tombstones; he refused, but agreed to cover the names with duct tape.

Halloween came and went, and still the tombstones remained. The simmering tension in the neighborhood eventually came to a boil on November 6, 2002, when the police were called because the duct tape had fallen off the tombstones and the names were visible again. Officer Bruce Mason and another officer went to the neighborhood to try once more to mediate the dispute. They spoke with Betty Garbarz and Diane Lesner, who told the officers they felt threatened by the display, which they saw as a means for Purtell to vent his anger over the dispute about his RV. The officers then went to the Purtell residence and

met with Jeff Purtell, explaining the depth of his neighbors' reaction to the tombstones. Purtell agreed to reapply the duct tape and came outside to do so. While he was reapplying the tape, Officer Mason asked him to take the tombstones down altogether. Officer Mason told Purtell the neighbors wanted him arrested because they felt threatened by the display. Purtell said that was not his intent.

While Officer Mason and Purtell were talking on the Purtells' front lawn, Bob Lesner, the Purtells' next-door neighbor and husband of Diane Lesner (the subject of one of the tombstones) arrived home. He came onto the Purtells' front lawn and began arguing with Jeff Purtell about the display. Tempers flared, a shouting match erupted, and Lesner chest-butted Purtell. After Officer Mason separated the men, he told Purtell if he did not agree to remove the tombstones, he would be arrested for disorderly conduct. Purtell again refused and was momentarily handcuffed. At that point, he rethought his options and relented, saying he would rather take the tombstones down than be arrested. Officer Mason removed the handcuffs, and Purtell dismantled the tombstone display.

The Purtells then sued Officer Mason for damages under 42 U.S.C. § 1983, asserting a First Amendment claim for violation of their free-speech rights and a Fourth Amendment claim for arresting Jeff Purtell without probable cause. Officer Mason moved for summary judgment on both counts, arguing that the arrest was supported by probable cause and he was entitled to qualified immunity because the speech on the tombstones was unprotected under the "fighting-words" doctrine. The district court granted the motion in part, holding there was probable cause to arrest Purtell for disorderly conduct, but con-

cluded that material factual issues precluded a ruling on qualified immunity on the First Amendment claim.

The case was then tried to a jury. At the close of evidence, the Purtells orally moved for judgment as a matter of law; the judge took the motion under advisement. The court had decided to submit the question of whether the speech on the tombstones constituted fighting words to the jury, but the parties disagreed over the proper language for the fighting-words jury instruction. Their dispute centered on whether the definition of fighting words should include words that "by their very utterance inflict injury or tend to incite an immediate breach of the peace"—the classic formulation from *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)—or ought to be limited to words that are inherently likely to incite an immediate breach of the peace. The Purtells argued that including speech that merely "inflicts injury" in the definition of unprotected fighting words could not be justified under more recent First Amendment case law. The district court disagreed and instructed the jury as follows:

> Let me explain what speech is protected by the First Amendment to the United States Constitution. Insofar as this case is concerned, any and all speech is protected by the First Amendment to the United States Constitution except what is referred to in law as "fighting words." In law, "fighting words" are abusive words or phrases (1) directed at the person of the addressee, (2) which by their very utterance inflict injury or tend to incite an immediate breach of the peace, that is, words that are likely to provoke a violent reaction, and (3) play no role in the expression of ideas.

The jury returned a verdict in favor of Officer Mason. The district court subsequently denied the Purtells' Rule 50 motion and entered judgment in favor of Officer Mason. The Purtells appealed.

## II. Analysis

The Purtells contend the district court's jury instruction defining fighting words misstated the law. They also challenge the denial of their Rule 50 motion, arguing that the inscriptions on the tombstones were fully protected speech under the First Amendment, not fighting words as that doctrine has evolved. Both arguments depend on whether speech that merely "inflicts injury"—as distinct from speech that "tends to incite an immediate breach of the peace"—may properly be regarded as fighting words under the Supreme Court's post-*Chaplinsky* case law. The Purtells also contend that summary judgment on the Fourth Amendment claim was improper. Officer Mason defends the summary judgment, the jury instruction, and the verdict. He argues in the alternative that he should not have been subjected to trial at all because he was entitled to qualified immunity; this determination also turns on the proper legal standard for fighting words.

There is considerable merit to the Purtells' argument about the current reach of the fighting-words doctrine (more on that later). However, we agree with Officer Mason that this case should not have been tried. Qualified immunity "shields government officials against suits arising out of their exercise of discretionary functions 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Jones v. Wilhelm*, 425 F.3d 455, 460 (7th Cir. 2005)

(quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). The doctrine of qualified immunity is broad, protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity leaves " 'ample room for mistaken judgments' by police officers." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003) (quoting *Malley*, 475 U.S. at 343). This case involves just such a reasonable mistake.

## A.  Qualified Immunity Standard

Whether a government official is entitled to qualified immunity is a legal question for resolution by the court, not a jury. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991); *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir. 1989); *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988). Qualified immunity "ordinarily should be decided by the court long before trial," *Hunter*, 502 U.S. at 228, "because '[t]he entitlement is an *immunity from suit* rather than a mere defense to liability,' " *id.* at 227 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The doctrine protects public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982); *see also Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006) ("Qualified immunity protects a defendant from liability as well as from the burden of standing trial. For that reason, courts should determine as early on in the proceedings as possible whether a defendant is entitled to qualified immunity.").

Qualified-immunity claims are determined by reference to the two-part inquiry established in *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, the court "must consider . . . this threshold question: Taken in the light most favorable to

the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.*; *see also Wilhelm*, 425 F.3d at 460 (citing *Saucier*, 533 U.S. at 201). If the answer to this question is "yes," then "the next, sequential step is to ask whether the right was clearly established" at the time of the alleged violation. *Saucier*, 533 U.S. at 201.

This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. As long as "officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Malley*, 475 U.S. at 341; *see also Wagner v. Washington County*, 493 F.3d 833, 837 (7th Cir. 2007). Stated differently, the "clearly established" inquiry asks whether "in the light of pre-existing law the unlawfulness. . . [of the conduct was] apparent." *Anderson*, 483 U.S. at 640. The plaintiff bears the burden of demonstrating the violation of a clearly established right. *Forman v. Richmond Police Dep't*, 104 F.3d 950, 957-58 (7th Cir. 1997).

*Saucier* made it clear that the two steps in the qualified-immunity determination "must be considered in proper sequence." 533 U.S. at 200. This "rigid order of battle" has been criticized on practical, procedural, and substantive grounds.[1] *See Brosseau v. Haugen*, 543 U.S. 194, 201-02 (2004)

---

[1] The "rigid" order of the *Saucier* test has been called into question because, among other things, it forces courts to resolve constitutional questions unnecessarily when there is no clearly

(continued...)

(Breyer, Scalia, and Ginsburg, JJ., concurring) ("a rigid 'order of battle' makes little administrative sense and can sometimes lead to a constitutional decision that is effectively insulated from review"). The Supreme Court recently granted certiorari to consider whether *Saucier* should be overruled. *Pearson v. Callahan,* 76 U.S.L.W. 3510 (2008) (directing the parties to "brief and argue the following question: 'Whether the Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001) should be overruled?' "). In the

---

[1] (...continued)

established right. *Morse v. Frederick*, 127 S. Ct. 2618, 2641 (2007) (Breyer, J., concurring and dissenting) ("Sometimes the rule will require lower courts unnecessarily to answer difficult constitutional questions, thereby wasting judicial resources. Sometimes it will require them to resolve constitutional issues that are poorly presented. Sometimes the rule will immunize an incorrect constitutional holding from further review. And often the rule violates the longstanding principle that courts should 'not . . . pass on questions of constitutionality . . . unless such adjudication is unavoidable.' " (citation omitted)); *Bunting v. Mellen*, 541 U.S. 1019, 1024-25 (2004) (Scalia, J., dissenting from denial of certiorari) (identifying *Saucier*'s procedural and substantive flaws and pointing out confusion among circuits about whether the order of the *Saucier* test is customary or mandatory); *Saucier v. Katz*, 533 U.S. 194, 210 (2001) (Ginsburg, J., concurring); *Lyons v. City of Xenia*, 417 F.3d 565, 580-84 (6th Cir. 2005) (Sutton, J., concurring) (describing the practical and legal anomalies of *Saucier*'s sequential-question mandate); *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 69-70 (1st Cir. 2002) (stating the rigid order of the *Saucier* test "makes sense where the issue is whether some abstract right exists[,] . . . [b]ut it is an uncomfortable exercise where . . . the answer whether there was a violation may depend on a kaleidoscope of facts not yet fully developed").

meantime, of course, we continue to apply the sequential approach it prescribed.[2]

## B. First Amendment Claim

The district judge declined to decide whether Officer Mason was entitled to qualified immunity on the First Amendment claim because she thought "there [was] a genuine issue of material fact as to whether [the officer] acted in an objectively reasonable manner when he asked Jeffrey Purtell to take down the tombstones." This was error. The historical facts were undisputed. Whether Officer Mason's actions were reasonable is the second half of the qualified-immunity inquiry. Whether the facts established a constitutional violation (the first half

---

[2] Officer Mason could have immediately appealed the denial of his qualified-immunity claim. *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996); *Mitchell v. Forsyth*, 472 U.S. 511, 524-25 (1985); *Coady v. Steil*, 187 F.3d 727, 730 (7th Cir. 1999). That he did not do so does not preclude us from resolving this appeal based on qualified immunity. *Pearson v. Ramos*, 237 F.3d 881, 883 (7th Cir. 2001) ("Even when there is a right of interlocutory appeal, a party can wait till the case is over and then appeal, bringing before us all nonmoot interlocutory rulings adverse to him. This principle is as applicable to rulings on immunity as to any other interlocutory rulings.") (citations omitted); *Kurowski v. Krajewski*, 848 F.2d 767, 773 (7th Cir. 1988) (holding that "a public official may raise questions of immunity on appeal from a final judgment, even though he bypassed an opportunity to take an interlocutory appeal"). This principle permits Officer Mason to raise qualified immunity as an alternative ground upon which to affirm the judgment in his favor.

of the immunity inquiry) requires a determination and application of the proper legal standard for fighting words. These were questions for the court, not the jury.

In *Chaplinsky*, the Supreme Court identified "certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem." 315 U.S. at 571-72. "These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 572. The Court observed that "such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."[3] *Id.*

---

[3] Although some of the Purtells' neighbors said they felt threatened by the tombstone display, Officer Mason prudently did not invoke the "true-threats" doctrine. A "true threat" has been defined as follows:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur."

*Virginia v. Black*, 538 U.S. 343, 359-60 (2003) (citations omitted) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)). Nor did Officer Mason attempt to defend his order to dismantle the

(continued...)

Although *Chaplinsky* purported to define fighting words in the alternative—words that "by their very utterance inflict injury *or* tend to incite an immediate breach of the peace," *id.* (emphasis added)—the statute under challenge in the case had been definitively construed by the state courts to apply *only* to speech falling in the latter category. Noting that "[t]he statute, as construed, does no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee," the Court upheld it against a facial challenge. *Id.* at 573 ("We are unable to say that the limited scope of the statute as thus construed contravenes the constitutional right of free expression."). The Court then rejected the as-applied challenge as well. The defendant in the case had been convicted for calling a law enforcement officer a "damn racketeer" and a "damn Fascist." *Id.* at 569. The Court held that "[a]rgument is unnecessary to demonstrate that the appellations 'damn racketeer' and 'damn Facist' are epithets likely to provoke the average person to retaliation, and thereby cause a breach of the peace." *Id.* at 574. Accordingly, the Court in *Chaplinsky* had no occasion to elaborate on the "inflict-injury" aspect of the fighting-words definition it had articulated.

In later cases, the Court has either dropped the "inflict-injury" alternative altogether or simply recited the full *Chaplinsky* definition without further reference to any distinction between merely hurtful speech and speech that tends to provoke an immediate breach of the peace. *See Virginia v. Black*, 538 U.S. 343, 359 (2003) (a cross-burning

---

[3] (...continued)

tombstones as a reasonable "time, place, or manner" restriction. *See R.A.V.,* 505 U.S. at 386.

case decided on threat-doctrine grounds in which the Court quoted the full *Chaplinsky* test but noted *Cohen v. California*'s narrowing of the fighting-words doctrine); *Texas v. Johnson*, 491 U.S. 397, 409 (1989) (in throwing out a flag-burning conviction, the Court dropped the inflict-injury prong of the *Chaplinsky* definition and confined fighting words to those that are "likely to provoke the average person to retaliation, and thereby cause a breach of the peace") (internal quotes omitted); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982) (describing fighting words as "those that provoke immediate violence"); *Lewis v. City of New Orleans*, 415 U.S. 130, 132 (1974) (quoting full *Chaplinsky* definition but omitting any reference to the inflict-injury prong); *Gooding v. Wilson*, 405 U.S. 518, 524-27 (1972) (same); *Cohen v. California*, 403 U.S. 15, 20 (1971) (modifying definition of fighting words to encompass "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction"); *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (stating speech is protected "unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest . . . [;] [t]here is no room under our Constitution for a more restrictive view"); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 414 (1992) (White, J., concurring) ("The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected.").

Although the "inflict-injury" alternative in *Chaplinsky*'s definition of fighting words has never been expressly overruled, the Supreme Court has never held that the government may, consistent with the First Amendment,

regulate or punish speech that causes emotional injury but does *not* have a tendency to provoke an immediate breach of the peace. *See* Note, *The Demise of the* Chaplinsky *Fighting Words Doctrine: An Argument for its Interment*, 106 HARV. L. REV. 1129, 1129 (1993) ("The jurisprudential history of the *Chaplinsky* doctrine has led some commentators to conclude that the Court has sub rosa overruled the entire fighting words doctrine, or at least the 'inflict injury' prong."); *see also* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 12-18, at 929 n.9 (2d ed. 1988) ("The Court has in effect incorporated the clear and present danger test into the fighting words doctrine."); Nadine Strossen, *Regulating Racist Speech on Campus: A Modest Proposal?*, 1990 DUKE L.J. 484, 508-09 (explaining that "the first prong of *Chaplinsky*'s fighting words definition, words 'which by their very utterance inflict injury,' was dictum"; the Court has subsequently "substantially narrowed *Chaplinsky*'s definition of fighting words by bringing that definition into line with *Chaplinsky*'s actual holding"). The justification for "plac[ing] fighting words outside the protection of the First Amendment" is not their capacity to inflict emotional injury—many words do that—but their tendency "to provoke a violent reaction and hence a breach of the peace." *Nuxoll* ex rel. *Nuxoll v. Indian Prairie Sch. Dist. #204,* No. 08-1050, 2008 WL 1813137, at *2 (7th Cir. Apr. 23, 2008).

We have previously held that speech inflicting psychic trauma alone—without any tendency to provoke responsive violence or an immediate breach of the peace—does not lose constitutional protection under the fighting-words doctrine. *Collin v. Smith*, 578 F.2d 1197, 1203 (7th Cir. 1978) ("A conviction for less than words that at least tend to incite an immediate breach of the peace cannot be justi-

fied under *Chaplinsky*.") *Collin* involved a proposed Nazi march through the Village of Skokie, Illinois. The parade would feature members of the National Socialist Party of America wearing the uniforms of the German Nazi Party and carrying Nazi flags bearing swastikas. Skokie had a large Jewish population and was home to many Holocaust survivors and their families; the potential for severe psychological injury as a result of the proposed Nazi parade was conceded. It was also conceded, however, that the march was not likely to provoke responsive violence or immediate breaches of the peace. Absent that tendency, we held the speech in question did not qualify as fighting words and remained constitutionally protected. *Id.*

We see nothing in the Supreme Court's more recent iterations of the fighting-words doctrine that would presage a revitalization of the "inflict-injury" alternative in the *Chaplinsky* definition. To the contrary, whatever vitality it may have had when *Chaplinsky* was announced, the "inflict-injury" subset of the fighting-words definition has never stood on its own. It seems unlikely that speech causing emotional injury but *not* tending to provoke an average person to an immediate breach of the peace would qualify as fighting words, unprotected by the First Amendment and therefore capable of being regulated or punished without raising any constitutional concern.

With this understanding of the contours of the fighting-words doctrine, we proceed to step one of the *Saucier* inquiry: whether Officer Mason violated the Purtells' free-speech rights by ordering Jeff Purtell to remove the tombstones or face arrest. The jury found for the officer, having been instructed that all speech is protected except fighting words, which it was told included words that

"inflict injury" *or* "tend to incite an immediate breach of the peace." As we have noted, it was error to submit this claim to the jury in the first place, but *not* because the facts do not make out a constitutional violation—they do, notwithstanding the jury's verdict to the contrary.

While the tombstones apparently elicited an emotional response from the Purtells' neighbors—embarrassment, anger, resentment, and for some, fear—the messages were not, in context, the sort of provocatively abusive speech that inherently tends to incite an immediate breach of the peace. These were Halloween decorations, after all. It is true their mocking messages were directed at particular neighbors as well as the passing public. *See Hess v. Indiana*, 414 U.S. 105, 107-08 (1973) (speech must be personally insulting and directed at particular person or group to be considered fighting words). But the average person, understanding the full context, would recognize the tombstone inscriptions as nothing more than an adolescent attempt at retaliatory ridicule—*not* the sort of inflammatory and personally abusive epithets that tend to provoke a violent reaction.

As importantly, the tombstones were on display for weeks without raising any potential for violence or disruption. Although an actual disturbance is not required for the doctrine to apply, *see Gower v. Vercler*, 377 F.3d 661, 670 (7th Cir. 2004), to qualify as fighting words, the speech in question must have a tendency to provoke an average person to commit an *immediate* breach of the peace. The tombstones did not have that tendency, and in fact for a long time stood on the Purtells' lawn without incident, sometimes with the neighbors' names obscured by duct tape, sometimes not. The neighbors complained to the police, but the scene remained quiet until

the November episode of shouting and chest-butting between Purtell and Bob Lesner. Such a belated breach of the peace cannot be attributed to the words themselves or used to demonstrate that the speech at issue was inherently provocative of a violent or "fighting" reaction.

Because the tombstones did not have an inherent tendency to incite an immediate breach of the peace, they did not fall within that "narrowly limited" class of unprotected speech defined by the fighting-words doctrine. Frankly, we doubt whether the words on the tombstones were strong enough to qualify as words that "by their very utterance inflict injury"—if that, standing alone, were enough to constitute fighting words. Considered in their context, the tombstones did not inflict the sort of severe, personal, and inherently injurious insult that the fighting-words doctrine contemplates, however wounded the Purtells' neighbors might actually have felt.

But Officer Mason's mistake in thinking he could constitutionally order Purtell to dismantle the tombstone display on pain of arrest was one a reasonable officer might make in this situation. Although the fighting-words doctrine has been with us for decades, it has not been entirely clear (as we have explained) whether speech that injures but does not incite an immediate breach of the peace is protected or unprotected. And Officer Mason reasonably may have misunderstood the immediacy requirement of the fighting-words doctrine in the context of this case. He did have a fight on his hands, and he reasonably believed he had the authority to force the removal of the irritant in order to keep the peace. In misapprehending the constitutionally protected status of the Purtells' tombstone speech, Officer

Mason did not violate clearly established rights.[4] First Amendment line-drawing is often difficult, even in hindsight. Officer Mason's on-the-street judgment, though mistaken, is entitled to qualified immunity.

## C.  Fourth Amendment Claim

The district court granted Officer Mason's motion for summary judgment on the Fourth Amendment claim, holding there was probable cause to arrest. *See Morfin v. City of East Chicago*, 349 F.3d 989, 997 (7th Cir. 2003) (stating that existence of probable cause bars § 1983 claim). This decision was manifestly correct. "Police ordinarily have probable cause if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " *Wagner*, 493 F.3d at 836 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). The facts and circumstances are considered as they appeared to Officer Mason at the time of arrest. *Id.*

Officer Mason arrested Purtell after witnessing his participation in a loud argument with his neighbor that

---

[4]  This conclusion is supported by the Purtells' inability to point to a closely analogous case that would be instructive to an officer faced with this situation. *See Forman v. Richmond Police Dep't*, 104 F.3d 950, 957-58 (7th Cir. 1997) (quoting *Powers v. Lightner*, 820 F.2d 818, 821 (7th Cir. 1987)) (stating plaintiff can meet burden of showing clearly established right by pointing to "closely analogous cases" decided before the defendants acted or failed to act).

had escalated to a chest-butt before the officer was able to intervene to prevent further physical altercation. This qualifies as disorderly conduct under Illinois law: "A person commits disorderly conduct when he knowingly . . . [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILL. COMP. STAT. 5/26-1(a)(1) (2006). That Bob Lesner was not also arrested is irrelevant. That the focus of the argument was the tombstones—protected speech—is likewise irrelevant. We have already held that Officer Mason is entitled to qualified immunity to the extent the arrest was related to Jeff Purtell's exercise of his First Amendment rights. The mounting public argument between Lesner and Purtell supplied probable cause to arrest for disorderly conduct apart from Purtell's exercise of free speech. Accordingly, there was no Fourth Amendment violation, and summary judgment on this claim was appropriate.

## III. Conclusion

In closing, a few words in defense of a saner use of judicial resources. It is unfortunate that this petty neighborhood dispute found its way into federal court, invoking the machinery of a justice system that is admired around the world. The suit was not so wholly without basis in fact or law as to be frivolous, but neither was it worth the inordinate effort it has taken to adjudicate it—on the part of judges, jurors, court staff, and attorneys (all, of course, at public expense). We take this opportunity to remind the bar that sound and responsible legal representation includes counseling as well as advocacy. The wiser course would have been to counsel the plaintiffs against filing such a trivial lawsuit. Freedom of speech

encompasses " 'the freedom to speak foolishly and without moderation,' " *Cohen*, 403 U.S. at 26 (quoting *Baumgartner v. United States*, 322 U.S. 665, 674 (1944)), but it does not follow that every nominal violation of that right is—or should be—compensable. *See Brandt v. Bd. of Educ. of City of Chi.*, 480 F.3d 460, 465 (7th Cir. 2007) ("[*D*]*e minimis non curat lex* (the law doesn't concern itself with trifles) is a doctrine applicable to constitutional as to other cases," and an award of nominal damages "presupposes a violation of sufficient gravity to merit a judgment, even if significant damages cannot be proved."). Not every constitutional grievance deserves an airing in court. Lawsuits like this one cast the legal profession in a bad light and contribute to the impression that Americans are an overlawyered and excessively litigious people.

AFFIRMED.