In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2356

JESUS GONZALEZ,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF WEST MILWAUKEE, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 09CV384—**Lynn Adelman**, *Judge.*

ARGUED NOVEMBER 29, 2010—DECIDED FEBRUARY 2, 2012

Before BAUER, WOOD, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Jesus Gonzalez was active in Wisconsin's "open carry" movement, which advocates for the right to carry unconcealed firearms in public. On two occasions in 2008 and 2009, he openly carried a holstered handgun into retail stores in the Village of West Milwaukee and the City of Chilton, Wisconsin. On each occasion he was arrested for disorderly conduct and his gun was confiscated. He was not prose-

cuted for either incident, however, and his handguns were eventually returned.

Gonzalez sued the arresting officers and the two municipalities under 42 U.S.C. § 1983, asserting several claims for relief. First, he alleged that the officers falsely arrested him in violation of the Fourth Amendment because his open carrying was not disorderly conduct and was protected under the state and federal constitutions. On this claim he sought damages and prospective declaratory relief. He also claimed the municipalities retained his handguns for too long after each arrest, amounting to an unconstitutional seizure of his property. Finally, he alleged that West Milwaukee and its officers violated § 7(a) and § 7(b) of the Privacy Act of 1974 when they obtained his Social Security number during the booking process.

The district court granted summary judgment for the defendants on all claims. The judge held that the officers had probable cause to arrest Gonzalez for disorderly conduct, or alternatively, were entitled to qualified immunity. The property-seizure claim was dismissed as both underdeveloped and meritless. Finally, the judge rejected the Privacy Act claims for two reasons: The § 7(a) claim was factually insufficient, and § 7(b) grants no private right of action enforceable under § 1983.

Gonzalez appealed. In the meantime several developments changed the contours of the case. Effective November 2011, Wisconsin adopted a concealed-carry permitting regime and in connection with that legislation, amended its statutes to clarify that openly carrying

a firearm is not disorderly conduct absent "circumstances that indicate a criminal or malicious intent." WIS. STAT. § 947.01(2); *see* Wis. Act 35, 2011-2012 Wis. Legis. Serv. 825, 849 (West). Also in November 2011, Gonzalez was convicted of homicide and may no longer lawfully possess firearms. These events moot his claim for prospective declaratory relief; his various claims for damages remain.

On the remaining claims, we affirm. Although the district court's probable-cause analysis did not sufficiently account for the right to bear arms under the state and federal constitutions, we agree that the officers are entitled to qualified immunity. At the time of the arrests, the state constitutional right to bear arms was relatively new, and Wisconsin law was unclear about the effect of the right on the scope of the disorderly conduct statute. Moreover, the Supreme Court had not yet decided *McDonald v. City of Chicago, Ill.*, 130 S. Ct. 3020, 3050 (2010), applying the Second Amendment to the States. Given this legal uncertainty, it was reasonable for the officers to believe that the circumstances of Gonzalez's open carrying gave them probable cause to arrest him for disorderly conduct. The delayed return of Gonzalez's handguns was not a "seizure" under the Fourth Amendment. Finally, Gonzalez's various Privacy Act claims fail for several reasons. Assuming the Act confers a private right of action, the officers did not violate § 7(a); they are entitled to qualified immunity for the alleged § 7(b) violation; and there is insufficient evidence that West Milwaukee

had a policy, custom, or practice that would give rise to municipal liability for the alleged § 7(b) violation.

## I.  Background

Because we are reviewing a grant of summary judgment in favor of the defendants, the following account describes the facts in the light most favorable to Gonzalez.

### A.  Gonzalez's Arrest in West Milwaukee

On May 14, 2008, Gonzalez entered a Menards home-improvement store in West Milwaukee, a suburb immediately adjacent to the City of Milwaukee. The store was "fairly busy," and there were about 75 employees in the building. Gonzalez wore a black leather trench coat and visibly carried a handgun in a black thigh holster. An employee saw the gun and was "startled"; he also thought the heavy trench coat was "out of place" for the season. He alerted assistant manager Kristopher McCloy and manager Jeffrey Jensen. McCloy regarded the alert as a "serious situation," and Jensen was "shocked, surprised," and concerned for the safety of his employees and customers.

McCloy, Jensen, and several other employees went to look for Gonzalez and found him near the children's play area. After debating the legality of having a firearm in the store, McCloy asked Gonzalez to secure the gun in his car before he continued shopping. Gonzalez refused. Some employees expressed concern

about the children nearby and told Gonzalez that they would call the police if he refused to leave. Gonzalez eventually complied with McCloy's request that he put his gun in his car before continuing his shopping.

In the meantime Jensen called the West Milwaukee Police Department, where he reached Officer Patrick Krafcheck. Jensen told Krafcheck there was a man with a gun in the store who was argumentative and was "creep[ing] people out" and generally making them uncomfortable and nervous. Krafcheck later described the gist of the call this way: There was a "man in the store with a gun" who was making people "nervous, wigged out, freaked out, geeked out, something to that effect." Krafcheck and Officer Charles Donovan went to Menards, where they found Gonzalez in the parking lot loading items into his pickup truck. Gonzalez was no longer carrying his gun but still wore the holster. Donovan asked Gonzalez where his gun was; Gonzalez refused to answer. Donovan then arrested Gonzalez for disorderly conduct. Krafcheck seized Gonzalez's gun, magazines, ammunition, and a gun case from the truck.

During the booking process at the West Milwaukee police station, Donovan and Krafcheck asked Gonzalez for his Social Security number, in addition to other basic identifying information. Neither officer informed Gonzalez whether disclosure of this information was mandatory, by what statutory authority they requested it, or what uses they would make of it. When Gonzalez resisted giving his identifying information, Krafcheck said "something to the effect of, [i]f we can't get the

information, you're going to be here longer than you need to be." The officers eventually obtained Gonzalez's Social Security card from his wallet. Gonzalez was released after booking with an order to attend a charging conference at the Milwaukee District Attorney's office. His gun and other property were held for several months until the district attorney decided not to press charges.

## B. Gonzalez's Arrest in Chilton

Sometime after 11 p.m. on April 10, 2009, Gonzalez visited a Wal-Mart store in Chilton, a small town about 40 miles south of Green Bay. Gonzalez again openly carried a handgun at his side. Because of the late hour, only about four customers and ten employees were in the store at the time. Gonzalez headed toward the sporting-goods department to buy ammunition. An employee saw the gun and alerted assistant manager Jennifer Fairchild. Fairchild felt "uneasy" because it was "late in the evening, and the gentleman was asking to purchase ammunition," which she found "very odd," especially for "such a little town." She was also alarmed because some employees were collecting money from the store's cash registers at the time, and she "did not know what [kind of] situation was truly going on."

Fairchild called the Chilton Police Department, and Officer Michael Young responded to the scene. When Young arrived and spoke to Fairchild, she "seemed like she was anxious and nervous" or "upset." Young found Gonzalez completing his ammunition purchase. Young

drew his gun, pointed it at Gonzalez, and told him to
"freeze." Young arrested Gonzalez for disorderly
conduct, took him to the police station, and tried to
contact the Calumet County District Attorney for
guidance about how to proceed. Unable to reach either
the district attorney or the assistant district attorney,
Young decided to release Gonzalez but retained his
gun. About two weeks later, the district attorney
notified Gonzalez that he would not be pressing charges
and Gonzalez could retrieve his gun.

## C. The District Court's Decision

Gonzalez sued Officers Krafcheck, Donovan, and
Young, alleging that they falsely arrested him in viola-
tion of the Fourth Amendment. He also claimed the
West Milwaukee and Chilton Police Departments
retained his handguns too long in violation of the
Fourth Amendment. Finally, he claimed that the request
for his Social Security number in connection with
his booking in West Milwaukee violated his rights
under the Privacy Act.

The district court granted summary judgment for the
defendants and dismissed all claims. The court held
that the West Milwaukee and Chilton officers had
probable cause to arrest Gonzalez for disorderly conduct
because "[n]o reasonable person would dispute that
walking into a retail store openly carrying a firearm is
highly disruptive conduct which is virtually certain to
create a disturbance." The court added that even if the
officers lacked probable cause, they were entitled to

qualified immunity. The court dismissed the property-seizure claim, finding it insufficiently developed and deficient on the merits; the court held that the municipalities did not violate the Fourth Amendment by retaining Gonzalez's firearms until after prosecutors decided not to file charges. Finally, the court rejected the Privacy Act claims against West Milwaukee and its officers, reasoning that (1) the officers did not violate § 7(a); (2) § 7(b) does not confer an individual right; and (3) even if § 7(b) did confer an actionable individual right, Gonzalez had not established that West Milwaukee had a policy or practice giving rise to municipal liability.

## II.  Discussion

We review the district court's order granting summary judgment de novo, construing the facts and drawing reasonable inferences in the light most favorable to Gonzalez. *Castronovo v. Nat'l Union Fire Ins. Co.*, 571 F.3d 667, 671 (7th Cir. 2009).

### A.  Fourth Amendment False-Arrest Claims

Gonzalez argues that the district court was wrong to reject his Fourth Amendment false-arrest claims against Officers Krafcheck, Donovan, and Young because the officers lacked probable cause to arrest him. Openly carrying a firearm, he contends, does not amount to disorderly conduct and is protected as an exercise of the right to bear arms for self-defense guaranteed by the Wisconsin Constitution and the Second Amendment.

Before addressing the merits, we note that one form of relief Gonzalez requests is now moot. After we heard argument and took this case under advisement, Wisconsin clarified its law on whether openly carrying a firearm can constitute disorderly conduct. Effective November 2011, the state legislature amended Wisconsin's longstanding ban on carrying concealed firearms and adopted a licensing regime in its place. *See* Wis. Act 35, 2011-2012 Wis. Legis. Serv. 825 (West). In that same legislation, lawmakers added the following language to the disorderly conduct statute:

> Unless other facts and circumstances that indicate a criminal or malicious intent on the part of the person apply, a person is not in violation of, and may not be charged with a violation of, this section for loading, carrying, or going armed with a firearm, without regard to whether the firearm is loaded or is concealed or openly carried.

WIS. STAT. § 947.01(2); *see* Wis. Act 35, 2011-2012 Wis. Legis. Serv. 825, 849 (West). The legislature also adopted a new statute similarly providing that openly carrying a firearm cannot constitute disorderly conduct under any local ordinance, subject to the same proviso regarding criminal or malicious intent. *See* WIS. STAT. § 66.0409(6); Wis. Act 35, 2011-2012 Wis. Legis. Serv. 825, 828 (West). Also in November 2011, Gonzalez was convicted of first-degree reckless homicide and sentenced to 20 years in prison. Accordingly, he cannot lawfully possess a firearm. *See* WIS. STAT. § 941.29(2)(a); 18 U.S.C. § 922(g)(1). These events moot Gonzalez's claim for

prospective declaratory relief but not his claim for damages against the individual officers.

"False arrest" is shorthand for an unreasonable seizure prohibited by the Fourth Amendment. *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005). To prevail on this claim, a plaintiff must show that the arresting officer lacked probable cause to make the arrest. *Jackson v. Parker*, 627 F.3d 634, 638 (7th Cir. 2010). An officer has probable cause to arrest if he has reason to believe, in light of the facts known at the time, that the suspect has committed or is about to commit a crime. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008); *Purtell v. Mason,* 527 F.3d 615, 626 (7th Cir. 2008).

The district court held that the West Milwaukee and Chilton officers had probable cause to arrest Gonzalez for disorderly conduct because "[n]o reasonable person would dispute" that openly carrying a firearm in a retail store "is highly disruptive conduct" and "virtually certain to create a disturbance." This is so, the court held, because store personnel and shoppers would "likely . . . be frightened and possibly even panicky," and would "likely . . . think that the person with the gun is either deranged or about to commit a felony or both." Someone would surely call the police, and "when police respond to a 'man with a gun' call, they have no idea what the armed individual's intentions are." This "inherently volatile situation," the court held, "could easily lead to someone being seriously injured or killed." The judge thought the facts of Gonzalez's two arrests confirmed these general observations. The judge summarily re-

jected Gonzalez's argument that the Second Amendment and the state constitutional right to bear arms affected the probable-cause analysis. In the alternative the court held that the officers are entitled to qualified immunity.

For reasons that will be apparent in a moment, the district court's probable-cause holding did not adequately account for the effect of the state constitutional right to bear arms on the crime of disorderly conduct in Wisconsin. At the time of Gonzalez's arrests, it was unclear whether a person who openly carries a firearm could be arrested for disorderly conduct in light of the state and federal constitutional guarantees. To hold, as the district court apparently did, that openly carrying a firearm in a retail store is disorderly conduct *as a categorical matter* goes too far. As we will see, at the relevant time, the question was far from settled.

Before proceeding, however, we note that without the constitutional right to bear arms in the mix, this would be a fairly straightforward case. Wisconsin's disorderly conduct statute provides: "Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor." WIS. STAT. § 947.01(1). Only the catch-all "otherwise disorderly" clause is implicated here, and the Wisconsin Supreme Court reads it quite broadly. The "otherwise disorderly" clause requires only that the defendant's

conduct be similar in kind to the conduct enumerated in the statute and that it have a *tendency* to cause or provoke a disturbance, either public or private; it need not *actually* cause a disturbance. *See State v. Schwebke*, 644 N.W.2d 666, 674-75 (Wis. 2002); *In re Douglas D.*, 626 N.W.2d 725, 737-38 (Wis. 2001); *In re A.S.*, 626 N.W.2d 712, 722-23 (Wis. 2001).

The Menards employee who first spotted Gonzalez with his holstered gun was "startled" and concerned enough about his own safety and the safety of others in the store that he alerted his manager and assistant manager. Gonzalez's attire also fueled suspicion; he was wearing a black leather trench coat, which was "out of place" for a day in mid-May. Jensen, the Menards manager, was "shocked" and said he felt "some sense of urgency" when he heard there was a man with a gun in the store. He was immediately concerned about the safety of shoppers and employees, and said there was "a lot of adrenaline pumping" during his encounter with Gonzalez. When he called the police and reached Officer Krafcheck, he reported that "everyone is like, oh, my God, this guy's got a gun in the store," and said Gonzalez was "creep[ing] people out." McCloy, the assistant manager, testified that he "didn't want a bunch of parents with their kids seeing a guy walk around with a gun on him. . . . [T]hat would have caused a little bit of panic, I believe." When he first approached Gonzalez, McCloy felt "a little bit afraid, but after talking to him, that feeling calmed down."

Fairchild, the Wal-Mart assistant manager, called the police because the company's policy manual instructed

her to do so whenever she felt that a "person would be of any harm to any of the associates or customers that were within the building." She felt "[v]ery nervous" about Gonzalez and his gun. It was late in the evening, employees were collecting money from the registers, and she was concerned for her own safety and the safety of her employees and customers.

Creating this kind of public unease and agitation is ordinarily sufficient to establish probable cause to arrest for disorderly conduct under Wisconsin law. *See State v. Givens*, 135 N.W.2d 780, 784 (Wis. 1965) ("The crime of disorderly conduct is based upon the principle that in an organized society one should so conduct himself as not to unreasonably offend the senses or sensibilities of others in the community." (quotation marks omitted)). Although the statute does not apply to conduct that offends the hypersensitive, *Douglas D.*, 626 N.W.2d at 737, the circumstances of Gonzalez's openly carrying a firearm were on the whole enough to give the officers reason to believe that persons of ordinary and reasonable sensibility would be disturbed.

Matters are not so straightforward, however, when the constitutional right to bear arms is factored in. At the time of Gonzalez's arrest, the legality of open carrying was debatable and had in fact been debated in two cases in the state supreme court testing the scope of Wisconsin's recently adopted constitutional provision guaranteeing an individual right to bear arms. *See State v. Cole*, 665 N.W.2d 328, 335-36 (Wis. 2003); *State v. Hamdan*, 665 N.W.2d 785 (Wis. 2003). (More about *Cole*

and *Hamdan* in a moment.) Accordingly, although we think the district court's probable-cause finding was too categorical, its alternative holding—that the officers were entitled to qualified immunity—was on much firmer ground.

"[Q]ualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). Claims of qualified immunity involve two inquiries: (1) whether the official violated a constitutional or statutory right, and (2) whether the right was clearly established at the time of the alleged misconduct. *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010). A negative answer to either question entitles the official to the defense. *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009). We may, in our discretion, take the second inquiry first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Whitlock*, 596 F.3d at 410. It makes good sense to do so here.

Gonzalez argues that openly carrying a firearm cannot be disorderly conduct because the people of Wisconsin have reserved to themselves a fundamental right to bear arms, secured by a recent amendment to the state constitution. Article I, § 25 of the Wisconsin Constitution provides: "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose." WIS. CONST. art. I, § 25. Adopted in 1998, Article I, § 25 appears in the state constitution's declaration of rights and has the status of a fundamental individual right. *Cole*, 665 N.W.2d at 335-36.

When the right-to-bear-arms provision was ratified, however, Wisconsin broadly prohibited the carrying of concealed weapons. *See* WIS. STAT. § 941.23 ("Any person except a peace officer who goes armed with a concealed and dangerous weapon is guilty of a Class A misdemeanor."), *amended by* Wis. Act 35, 2011-2012 Wis. Legis. Serv. 825, 843 (West) (effective Nov. 1, 2011). The crime of carrying a concealed weapon had been on the books in one form or another since 1872. *See Cole*, 665 N.W.2d at 331-32. Before its sweeping modification in 2011, the concealed-weapon statute was in significant tension with the newly adopted constitutional right.

Gonzalez argues that because section 941.23 prohibited him from carrying his handgun concealed, carrying it openly was the only way he could meaningfully exercise his state constitutional right to bear arms; his acts of open carrying therefore could not be punished as disorderly conduct. He is not alone in this view. In a pair of cases in the state supreme court in 2003, the Wisconsin Department of Justice ("DOJ") advanced the open-carry option in defending the concealed-weapon statute against facial and as-applied challenges under the newly ratified state constitutional right to bear arms. *See Cole*, 665 N.W.2d 328; *Hamdan*, 665 N.W.2d 785. The Attorney General argued that although carrying a concealed firearm was a crime, "a person lawfully in possession of a firearm will always retain the ability to keep the firearm in the open—holding the weapon in the open, keeping the weapon in a visible holster, displaying the weapon on the wall, or otherwise placing the weapon in plain view." *Hamdan*, 665 N.W.2d at 808-09. Because firearms

could be kept or carried in the open, banning concealed carry did not violate the Article I, § 25 right to bear arms. *Id.* Or so the Attorney General argued.

The Wisconsin Supreme Court was skeptical of this aspect of the Attorney General's case, casting doubt on the view that open carrying was always a viable option. In *Hamdan* the court noted that openly carrying or displaying a firearm would often be "impractical, unsettling, and possibly dangerous," and "could expose a gun owner to other liability, both criminal and civil." *Id.* at 809. Indeed, the court cited the disorderly conduct statute to illustrate the kind of criminal liability that might arise from openly carrying a firearm. *Id.* (citing WIS. STAT. § 947.01). In the end, resolving questions about open-carry rights was unnecessary to decide *Cole* and *Hamdan*. In *Cole* the court rejected the facial challenge to the concealed-weapon statute but held it was subject to individual as-applied challenges. 665 N.W.2d at 340-45. In *Hamdan* the court crafted a framework for adjudicating as-applied constitutional challenges to individual prosecutions under section 941.23. 665 N.W.2d at 809-11. The dispute about open carrying was left for another day.

The open-carry issue was still unsettled when Gonzalez was arrested in West Milwaukee in May 2008 and in Chilton in April 2009. Soon after the Chilton arrest, however, the Attorney General issued an informal Advisory Memorandum titled "The Interplay Between Article I, § 25 Of The Wisconsin Constitution, The Open Carry of Firearms And Wisconsin's Disorderly Conduct Statute, Wis.

Stat. § 947.01." Though not a formal Attorney General's opinion, the Advisory was directed to Wisconsin's district attorneys and intended for the education of front-line prosecutors and law-enforcement officers within their jurisdictions. Issued on April 20, 2009, the Advisory begins by noting that the DOJ had received "multiple inquires" asking whether openly carrying a firearm could be prosecuted as disorderly conduct. The Attorney General's response: "The Wisconsin Department of Justice . . . believes that the mere open carrying of a firearm by a person, absent additional facts and circumstances, should not result in a disorderly conduct charge from a prosecutor."

The Advisory emphasized that any decision to charge an act of open carrying as disorderly conduct "necessarily depends on the totality of the circumstances," but "must take into account the constitutional protection afforded by Article I, § 25 of the Wisconsin Constitution." To illustrate, the Advisory gave two examples at opposite extremes: "[A] hunter openly carrying a rifle or shotgun on his property during hunting season while quietly tracking game should not face a disorderly conduct charge," but "if the same hunter carries the same rifle or shotgun through a crowded street while barking at a passerby, the conduct may lose its constitutional protection."

To the extent the DOJ's advice helped to guide the discretion of Wisconsin prosecutors and police officers before the concealed-weapon and disorderly conduct statutes were amended in 2011, it could be of no use to

the officers here, who were faced with a decision whether to arrest Gonzalez for disorderly conduct *before* the Advisory was issued.[1] Officers Krafcheck, Donovan, and Young were acting at a time of significant legal uncertainty about how to draw a difficult constitutional line; as such, qualified immunity applies. *See Purtell*, 527 F.3d at 625-26. Although Gonzalez vigorously argues to the contrary, the right to openly carry a firearm was hardly well established under the state constitution at the time of his arrests. Until the 2011 amendment to section 947.01, the legal landscape was uncharted.

Gonzalez also relies on the Second Amendment, but this argument is not well developed. Invoking *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), he argues that the core Second Amendment right to bear arms for self-defense must include the right to openly carry a holstered handgun. But *Heller* was decided *after* Gonzalez's arrest in West Milwaukee. And *McDonald*, 130 S. Ct. at 3050, which applied the Second Amendment to the States, was decided after *both* arrests. Whatever the Supreme Court's decisions in *Heller* and *McDonald* might mean for future questions about open-carry rights, for now this is unsettled territory. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA

---

[1] Gonzalez filed this lawsuit four days after his arrest in Chilton, six days before the DOJ issued the Advisory. Indeed, the Advisory specifically notes the recent filing of Gonzalez's suit.

L. REV. 1443, 1520 (2009) (open-carry rights under the Second Amendment may be "a major area of debate in courts in the coming years"); *see also* Nelson Lund, *Two Faces of Judicial Restraint (Or Are There More?) in* McDonald v. City of Chicago, 63 FLA. L. REV. 487, 505 (2011) ("We do not yet know how the courts will rule on laws that forbid both open and concealed carry of fire-arms.").[2]

The "clearly established" inquiry in qualified-immunity analysis asks whether the unlawfulness of the officer's conduct would have been apparent to a reasonable officer in light of *pre-existing law*. *See Purtell*, 527 F.3d at 621. Here, the most that can be said is that the officers failed to make a sensitive judgment about the effect of the state constitutional right to bear arms on the disorderly conduct statute and failed to predict *Heller* and *McDonald*. To the extent that any mistakes about probable cause were made, they were entirely understandable;

---

[2] For further discussion of the tension between the Second Amendment and concealed-carry bans, and the practical and legal difficulties of open carrying, *see, e.g.*, Nelson Lund, *The Second Amendment,* Heller, *and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1359-62 (2009); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1521-24 (2009); Michael P. O'Shea, *The Right to Defensive Arms After* District of Columbia v. Heller, 111 W. VA. L. REV. 349, 377-79 (2009); *see also Minutes from a Convention of The Federalist Society: Civil Rights: The* Heller *Case*, 4 N.Y.U. J. L. & LIBERTY 293, 321-23 (2009).

state law was in flux, and the meaning and application of the Second Amendment was then under consideration by the Supreme Court.[3] "Qualified immunity tolerates reasonable mistakes regarding probable cause." *Whitlock*, 596 F.3d at 413. Because open-carry rights were not

---

[3] An additional complexity arises where, as here, the open carrying occurred on private property. As we have noted, section 947.01 punishes disorderly conduct "in a public *or* private place." WIS. STAT. § 947.01(1) (emphasis added). Gonzalez was arrested for disorderly conduct for openly carrying his handguns on private property, albeit property held open to the public; though the Menards and Wal-Mart stores had some obligations to invitees as places of public accommodation, the property retained its character as private property. *See Lloyd Corp. v. Tanner,* 407 U.S. 551, 569 (1972) ("Nor does property lose its private character merely because the public is generally invited to use it for designated purposes); *Jacobs v. Major,* 407 N.W.2d 832, 835, 838-40 (Wis. 1987). It's not clear how the disorderly conduct statute applies in cases involving conflicts between an individual's right to bear arms and a private-property owner's right to set the terms of admittance. There might be a distinction between the "disorderliness" of openly carrying a gun in a public place and the "disorderliness" of openly carrying a gun on private property over the objection of the owner. The recent amendments to section 947.01 do not specifically address the matter; as we have noted, under the amended statute, carrying a firearm—whether openly or concealed—does not constitute disorderly conduct "[u]nless other facts and circumstances . . . indicate a criminal or malicious intent." WIS. STAT. § 947.01(2); *see* Wis. Act 35, 2011-2012 Wis. Legis. Serv. 825, 849 (West).

clearly established under the state or federal constitutions at the time of Gonzalez's arrests, the officers are entitled to qualified immunity.

**B.  Illegal-Seizure Claim Against the Municipalities**

Gonzalez also argues that the Village of West Milwaukee and the City of Chilton violated his rights under the Fourth Amendment by retaining his handguns too long after the initial seizure. As in the district court, Gonzalez does not meaningfully develop this argument on appeal, and we agree with the district court that *Lee v. City of Chicago*, 330 F.3d 456 (7th Cir. 2003), forecloses the claim. In *Lee* we held that "[o]nce an individual has been meaningfully dispossessed, the seizure of the property is complete." *Id.* at 466. In other words, a "seizure" of property occurs when property is taken from its owner; normally—and here, given the short duration of the deprivation—the government's *continued* possession is not separately actionable as a Fourth Amendment violation. *Id.* at 460. *But see Segura v. United States*, 468 U.S. 796, 812 (1984) ("[A] seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration . . . .").

Gonzalez argues, however, that in *Lee* the initial seizure of property was lawful, whereas here his gun "was not lawfully seized in the first place." Even if Gonzalez were correct, the distinction is immaterial. *Lee*'s holding that a seizure occurs upon the initial act of dispossession does not depend on the legality of the seizure. Stated

differently, continued retention of unlawfully seized property is not a separate Fourth Amendment wrong. The district court properly granted summary judgment for the municipalities on Gonzalez's illegal-seizure claim.

## C.  Privacy Act Claims Against West Milwaukee and Its Officers

The Privacy Act of 1974 aims to safeguard personal identifying information by regulating how governmental agencies collect, maintain, use, and disseminate it. *See* Privacy Act of 1974, § 2(b)(1), 5 U.S.C. § 552a (2011). Gonzalez maintains that West Milwaukee and Officers Krafcheck and Donovan violated two provisions of § 7 of the Act when they obtained his Social Security number during the booking process. More specifically, he claims West Milwaukee and its officers violated § 7(a), which makes it unlawful for a governmental agency to deny "any right, benefit, or privilege" based on a person's "refusal to disclose his social security account number," and § 7(b), which requires governmental agencies to provide certain explanatory information when they ask for a person's Social Security number.

### 1.  *Applicability of § 7 to Municipal Agencies*

Before addressing the merits, there is a threshold dispute about whether § 7 even applies to municipalities. By its terms § 7 applies to "[a]ny Federal, State or local government agency." However, based on the unusual way in which the Privacy Act is codified in the U.S.

Code, the Sixth Circuit has concluded that the Privacy Act "applies solely to federal agencies." *See Schmitt v. City of Detroit*, 395 F.3d 327, 328 (6th Cir. 2005).

When Congress passed the Privacy Act and published it in the Statutes at Large as Public Law 93-579, the statute contained §§ 2 through 9, and of these, only § 3 was codified in the main text of the Code, at 5 U.S.C. § 552a, pursuant to the directives of § 4. There were no instructions pertaining to the codification of the other sections, so the revisor of the Code placed them in the "Historical and Statutory Notes" accompanying 5 U.S.C. § 552a, instead of as a separate section in the main text. *See Schwier v. Cox*, 340 F.3d 1284, 1288 (11th Cir. 2003). Section 3(a)(1) states that "[f]or purposes of this section," the term "agency" is defined by ultimate reference to 5 U.S.C. § 551(1),[4] which provides that " 'agency' means each authority of the Government of the United States."

In *Schmitt* the Sixth Circuit interpreted the phrase "[f]or purposes of this section" in § 3(a)(1) to refer to all of 5 U.S.C. § 552a, including its notes. The court found § 7 "inherently inconsistent" with § 3 because § 3(a)(1)'s definition of "agency" "contains no language to indicate that it does not apply to the Privacy Act as a whole," while

---

[4] Section 3(a)(1) defines "agency" by reference to 5 U.S.C. § 552(e), but that section was redesignated as § 552(f) by the Freedom of Information Reform Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (1986). Section 552(f), in turn, refers to the definition in 5 U.S.C. § 551(1). *See Schmitt v. City of Detroit*, 395 F.3d 327, 329 (6th Cir. 2005).

§ 7 "by its terms includes state and local agencies within its ambit." *Schmitt*, 395 F.3d at 330. The court could not reconcile the inconsistency and looked to two sources to decide which provision should prevail: (1) the congressional findings and purposes expressed in § 2 of the Act; and (2) a Senate report in the Act's legislative history. These sources led the court to conclude that the Privacy Act applies exclusively to federal agencies. *Id.* at 331.

The Eleventh Circuit, on the other hand, as well as some district courts—including the district court here—have adhered to § 7's plain language. *See Schwier*, 340 F.3d at 1288-89; *Ingerman v. Del. River Port Auth.*, 630 F. Supp. 2d 426, 437-38 (D.N.J. 2009).[5] *Schwier* and *Ingerman* rely on *United States v. Welden*, 377 U.S. 95 (1964), a case that exposes the flaws in the Sixth Circuit's reasoning. In *Welden* the Supreme Court explained that when a Statute at Large takes on a rearranged form in the U.S. Code, the rearrangement carries no significance. *See id.* at 98 n.4. Even for those titles of the Code that Congress has enacted into positive law, including Title 5, the Court said any change of arrangement "cannot be regarded as altering the scope and purpose of the enactment. For it will not be inferred that Congress, in

---

[5] In *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999), the Ninth Circuit held that "the prohibitions of § 7(a)(1) apply to all governmental entities, including state and local governments," although it went on to find that § 7 cannot be enforced through 42 U.S.C. § 1983. The defendants incorrectly cite *Dittman* for a contrary proposition.

revising and consolidating the laws, intended to change their effect, unless such intention is clearly expressed." *Id.* (quotation marks omitted).[6]

Following *Welden* and the Eleventh Circuit's reasoning in *Schwier*, we see no conflict between §§ 3 and 7. As published in the Statutes at Large, the Privacy Act

---

[6] To appreciate these statements in *Welden*, some background on the mechanics of the legislative process may be helpful. After laws are passed by Congress and signed by the President, they are published in chronological order in the Statutes at Large, which serve as "legal evidence" of the law. *See* 1 U.S.C. § 112; Mary Whisner, *The* United States Code, *Prima Facie Evidence, and Positive Law*, 101 LAW LIBR. J. 545, 546 (2009) (hereinafter "Whisner"). But "[b]ecause that chronological arrangement isn't efficient for researchers," the statutes are arranged by subject matter for publication in the U.S. Code. *See* Whisner, at 546; *see also* 2 U.S.C. § 285b. The Code is generally considered "prima facie" evidence of the laws, yielding to the Statutes at Large in cases of conflict. *See* 1 U.S.C. § 204(a); Whisner, at 546-47.

In an ongoing process, however, the Office of Law Revision Counsel has prepared and continues to prepare titles of the Code for reenactment as positive law by Congress. The positive-law-codification process is meant to "remove ambiguities, contradictions, and other imperfections both of substance and of form," while "conform[ing] to the understood policy, intent, and purpose of the Congress in the original enactments." 2 U.S.C. § 285b(1); *see also* Whisner, at 553-56. With respect to those titles that Congress has enacted into positive law, the Code constitutes "legal evidence" of the law. *See* 1 U.S.C. § 204(a). For a list of these titles, see *id.* at § 204 note.

contains eight separately numbered sections, and it seems clear that when § 3(a)(1) defines agencies as *federal* agencies "[f]or purposes of *this section*," it refers *only* to § 3. (Emphasis added.) Section 3's subsequent codification at 5 U.S.C. § 552a and § 7's relegation to the "Historical and Statutory Notes" in the same section of the Code cannot change the statute's meaning. Accordingly, there is no need to look beyond the unambiguous text of § 7 to determine its applicability. By its express terms, § 7 applies to federal, state, and local agencies.[7]

### 2. Enforceability of § 7 Through 42 U.S.C. § 1983

The defendants argue that even if § 7 applies to municipal agencies, Gonzalez cannot use § 1983 to remedy a § 7 violation. As the Supreme Court has explained,

> § 1983 does not provide an avenue for relief every time a state actor violates a federal law. . . . [T]o sustain a § 1983 action, the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs.
>
> Even after this showing, "there is only a rebuttable presumption that the right is enforceable under

---

[7] On a similar analysis, we reject the defendants' attempt to claim protection under the exemption provided in § 3(j)(2) of the Privacy Act. That provision states that certain records "pertaining to the enforcement of criminal laws" may be "exempt . . . from any part of *this section*." (Emphasis added.) We read the exemption to apply only to the requirements of § 3.

§ 1983." The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right. Our cases have explained that evidence of such congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." "The crucial consideration is what Congress intended."

*City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 119-20 (2005) (citations omitted). Two questions thus arise: Does § 7 create individual rights? And even if so, have the defendants rebutted the presumption that the individual rights are enforceable under § 1983?

Based on its reading of the statutory text, the district court concluded that § 7(a)(1) creates an individual right enforceable through § 1983, while § 7(b)(1) does not. *See Jogi v. Voges*, 480 F.3d 822, 828 (7th Cir. 2007) (stating that there are "two relevant inquiries" for determining whether a statute confers an individual right: "(1) whether the statute by its terms grants private rights to any identifiable class; and (2) whether the text of the statute is phrased in terms of the persons benefitted"). However, other courts have disagreed about which parts of § 7, if any, are enforceable through § 1983. *See, e.g., Schwier*, 340 F.3d at 1291-92 (holding that all of § 7 can be enforced through § 1983 but examining only the language of § 7(a)); *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999)

(holding that § 7(a) is not enforceable through § 1983).[8] At a minimum this disagreement suggests that the issue is not easy. We need not wrestle with it here. The Privacy Act claims fail for far more straightforward reasons.

### 3. *Section 7(a) Claim*

With exceptions not applicable here, § 7(a)(1) of the Privacy Act makes it unlawful for an agency to "deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number." Gonzalez argues that the West Milwaukee officers violated § 7(a) when they asked for his Social Security number and told him "that he would be incarcerated over the weekend if he did not disclose the number."

The factual record simply does not support this claim. The officers asked Gonzalez for a variety of identifying information, including his name, date of birth, address, and Social Security number. Krafcheck testified in deposition that "[a]ll these things became hard to get from

---

[8] The defendants also cite *Polchowski v. Gorris*, 714 F.2d 749 (7th Cir. 1983), to support their argument that § 1983 cannot be used to enforce § 7. *Polchowski* states that the "comprehensive private remedies" available under the Privacy Act "appl[y] only to agencies of the United States Government," but it is clearly referring to only § 3, not § 7. *See id.* at 752. To the extent *Dittman* relies on *Polchowski*, *see* 191 F.3d at 1028-29, *Dittman* is unpersuasive.

[Gonzalez], and we needed to get that information before we could . . . let him go." So Krafcheck told Gonzalez "something to the effect of, [i]f we can't get the information, you're going to be here longer than you need to be." The officers eventually found Gonzalez's Social Security card in his wallet. Gonzalez neither disputes Krafcheck's account nor adds additional detail.

Krafcheck's sparse testimony does not support a § 7(a) violation. First, there is no evidence that the officers denied Gonzalez any "right, benefit, or privilege," or even threatened to do so "because of" his refusal to disclose his Social Security number. The officers sought a variety of basic identifying information from Gonzalez, all of which proved difficult to obtain. Perhaps they would have been satisfied had Gonzalez willingly provided his name, birthdate, and address. Regardless, because the officers eventually obtained Gonzalez's Social Security number from his wallet and promptly released him, there was no actual "denial" of any right, benefit, or privilege. The claimed § 7(a) violation is factually unsupported.

### 4. *Section 7(b) Claim*

Section 7(b) of the Privacy Act provides that an agency that "requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it." It is undisputed that when the West Milwaukee officers asked Gonzalez

for his Social Security number, they did not give him the information listed in § 7(b).

The omission, however, is covered by qualified immunity. At the time of Gonzalez's arrest, the officers' obligation to make the disclosures specified in § 7(b) was not clearly established. Our holding that § 7 applies to municipalities resolves a question of first impression in this circuit; the Sixth Circuit has held otherwise. Under these circumstances it would not have been " 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Purtell*, 527 F.3d at 621 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). At most Krafcheck and Donovan made a reasonable mistake; qualified immunity shields officers from liability for precisely this kind of error.

Gonzalez also asserted a *Monell* claim against West Milwaukee for the alleged § 7(b) violation. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipality can be liable under § 1983 only if its officers acted pursuant to: (1) an official policy; (2) a practice or custom that although not officially authorized, was widespread and well settled; or (3) instructions from a city official with final policy-making authority. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690). Gonzalez's claim against West Milwaukee rests entirely on the officers' testimony that they asked for his Social Security number as "part of the booking process," and they were "[g]oing down [a] checklist." Without more, this snippet of testimony is not enough for a reasonable jury to find that West

Milwaukee had an official policy, that the officers were acting under instructions from a policy-making superior, or that asking for Social Security numbers without making the § 7(b) disclosures was a widespread practice in the West Milwaukee Police Department. The district court properly granted summary judgment for West Milwaukee and its officers on the Privacy Act claims.

AFFIRMED.