In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1976
AMANDA PIERNER-LYTGE,
 Plaintiff-Appellant,
 v.

MONTRELL E. HOBBS and FREDRICK GLADNEY,
 Defendants-Appellees.
 ____________________

 Appeal from the United States District Court for the
 Eastern District of Wisconsin.
 No. 20-cv-00567 — J.P. Stadtmueller, Judge.
 ____________________

 ARGUED FEBRUARY 8, 2023 — DECIDED FEBRUARY 23, 2023
 ____________________

 Before FLAUM, KIRSCH, and JACKSON-AKIWUMI, Circuit
Judges.
 FLAUM, Circuit Judge. One day in April 2020, Amanda
Pierner-Lytge strapped a rifle to her back and walked to a lo-
cal park. The rifle on its own was large, but perhaps even
more eye-catching was the spike bayonet aﬃxed to its barrel.
Multiple parkgoers reported their concerns to the police. Of-
ficers arrived at the park and arrested Pierner-Lytge for dis-
orderly conduct; however, charges were never brought.
2 No. 22-1976

 Shortly after her arrest, Pierner-Lytge filed a civil rights
action against two of the arresting oﬃcers—Montrell Hobbs
and Fredrick Gladney—alleging violations of her First and
Fourth Amendment rights. The district court granted the of-
ficers’ motion for summary judgment. On appeal, Pierner-
Lytge challenges the district court’s conclusion that the oﬃc-
ers are entitled to qualified immunity on her Fourth Amend-
ment claim. For the following reasons, we aﬃrm.

 I. Background

 A. Factual Background
 Pierner-Lytge lives in West Allis, Wisconsin, and works as
a private security officer. She is a staunch supporter of the
Second Amendment who believes that by openly carrying
firearms in public, she brings attention to one’s right to bear
arms. Pierner-Lytge admits that this behavior causes a dis-
turbance in her neighborhood. Indeed, people have previ-
ously reported her to the police. On two prior occasions,
Pierner-Lytge had contact with officers because she was
openly carrying a rifle.
 On the evening of April 1, 2020, Pierner-Lytge walked
from her home to Rainbow Park—a public park near Walker
Elementary School that contains a playground and a baseball
field. At the time, most indoor public places were closed be-
cause of the COVID-19 pandemic. As such, many children
and families were reportedly at Rainbow Park that evening.
 At the park, Pierner-Lytge carried a rifle with a spike bay-
onet bolted to the end of the barrel. Combined, the rifle and
bayonet measured five feet long. In addition, Pierner-Lytge
had a black semi-automatic handgun holstered to her right
No. 22-1976 3

hip and wore a duty belt containing pepper spray, a baton,
and two pairs of handcuffs.
 Hobbs, a Deputy Sheriff with the Milwaukee County Sher-
iff’s Office, and Gladney, a Sergeant with the same office,
were on duty at the time. At approximately 6:57 P.M., Hobbs
went to Rainbow Park in response to three reports of an
armed woman sitting near the baseball field with “lots of kids
and families around.” When Hobbs arrived, he spoke to one
of the individuals who had called the police. The witness told
him that, for about ten minutes, Pierner-Lytge had been sit-
ting on the bleachers with a rifle and watching families walk
by, which made the witness and her family uncomfortable.
 Hobbs observed Pierner-Lytge sitting on the bleachers
smoking a cigarette with the rifle and bayonet on her back.
Once back-up arrived, Hobbs and another officer approached
Pierner-Lytge, identified themselves, and informed her that
they had received multiple calls from people concerned about
her conduct. The officers asked her what she was doing;
Pierner-Lytge replied that she was exercising her Second
Amendment rights and playing Pokémon Go. She also con-
firmed that she had a concealed carry weapon license but said
she did not have it with her at the time.
 Sergeant Gladney later arrived on the scene. Together,
Hobbs and Gladney consulted the West Allis Police Depart-
ment and learned that the agency had interacted with Pierner-
Lytge multiple times under similar circumstances. The De-
partment further informed them that Pierner-Lytge had pre-
viously resisted arrest and threatened officers and that she
had been the subject of mental health detention proceedings
on six prior occasions.
4 No. 22-1976

 After learning this information, the officers arrested
Pierner-Lytge for the crime of disorderly conduct. They in-
structed her to slowly place the rifle on the ground, and she
complied. The officers then confiscated her rifle, bayonet,
handgun, and duty belt.
 At the time, because of the COVID-19 pandemic, the Sher-
iff’s Office was issuing “order-in” cards that required an ar-
restee to appear at the Milwaukee County District Attorney’s
Office (the “MCDA”) on a later date. Accordingly, Pierner-
Lytge was released from custody and given an order to ap-
pear at the MCDA on June 9, 2020. However, the MCDA ulti-
mately did not charge Pierner-Lytge, and all her seized prop-
erty has since been returned.
 B. Procedural Background
 About one week after her arrest, Pierner-Lytge filed a law-
suit against Hobbs and Gladney pursuant to 42 U.S.C. § 1983.
She alleges that the officers violated her Fourth Amendment
rights by arresting her without probable cause. The officers
moved for summary judgment, and the district court granted
their motion, concluding that the officers are entitled to qual-
ified immunity. Pierner-Lytge now appeals.1

 1 Pierner-Lytge also alleges that Gladney violated her First Amend-

ment rights by forcing her to stop recording her encounter with the police.
Pierner-Lytge does not advance any arguments related to that claim on
appeal and does not respond to Gladney’s contention that this amounts to
waiver. As a result, Pierner-Lytge has waived any arguments related to
the judgment of her First Amendment claim. See Greenbank v. Great Am.
Assurance Co., 47 F.4th 618, 629 (7th Cir. 2022); Terry v. Gary Cmty. Sch.
Corp., 910 F.3d 1000, 1008 n.2 (7th Cir. 2018).
No. 22-1976 5

 II. Discussion

 We review the district court’s grant of summary judgment
de novo. Smith v. City of Janesville, 40 F.4th 816, 821 (7th Cir.
2022). Summary judgment is appropriate if “there is no genu-
ine dispute of material fact” and the moving party “is entitled
to judgment as a matter of law.” Fed. R. Civ. P. 56(a). In ap-
plying this standard, we read the facts and draw all reasona-
ble inferences in the light most favorable to Pierner-Lytge, the
non-moving party. Parker v. Brooks Life Sci., Inc., 39 F.4th 931,
936 (7th Cir. 2022).
 A. Probable Cause
 In broad terms, § 1983 authorizes suits against state gov-
ernment officials who violate an individual’s federal rights.
42 U.S.C. § 1983. Here, Pierner-Lytge alleges that Hobbs and
Gladney violated her Fourth Amendment rights by arresting
her without probable cause. Probable cause exists “when a
reasonable officer with all the knowledge of the on-scene of-
ficers would have believed that the suspect committed an of-
fense defined by state law.” Jump v. Village of Shorewood, 42
F.4th 782, 789 (7th Cir. 2022). The probable cause “inquiry is
purely objective, and the officer’s subjective state of mind and
beliefs are irrelevant.” Johnson v. Myers, 53 F.4th 1063, 1068
(7th Cir. 2022) (citation and internal quotation marks omit-
ted). Further, we account for the “totality of the circum-
stances” rather than “dissect[ing] every fact in isolation.”
Jump, 42 F.4th at 789.
 In this case, Pierner-Lytge was arrested for the crime of
disorderly conduct, which is defined as:
 (1) Whoever, in a public or private place, en-
 gages in violent, abusive, indecent, profane,
6 No. 22-1976

 boisterous, unreasonably loud or otherwise dis-
 orderly conduct under circumstances in which
 the conduct tends to cause or provoke a disturb-
 ance is guilty of a Class B misdemeanor.
 (2) Unless other facts and circumstances that in-
 dicate a criminal or malicious intent on the part
 of the person apply, a person is not in violation
 of, and may not be charged with a violation of,
 this section for loading a firearm, or for carrying
 or going armed with a firearm or a knife, with-
 out regard to whether the firearm is loaded or
 the firearm or the knife is concealed or openly
 carried.
Wis. Stat. § 947.01.
 Section 947.01(1) captures “any type of conduct that is dis-
orderly.” Doubek v. Kaul, 2022 WI 31, ¶ 14 (emphasis added).
As such, the Wisconsin Supreme Court reads the “catch-all”
term, “otherwise disorderly conduct,” “quite broadly” to
mean “only that the defendant’s conduct be similar in kind to
the conduct enumerated in the statute and that it have a ten-
dency to cause or provoke a disturbance, either public or pri-
vate; it need not actually cause a disturbance.” Gonzalez v. Vil-
lage of West Milwaukee, 671 F.3d 649, 656 (7th Cir. 2012) (quot-
ing § 947.01(1)). At issue here is this expansive catch-all term;
Pierner-Lytge insists that she did not engage in “otherwise
disorderly conduct.” § 947.01(1).
 Pierner-Lytge further argues that her carrying of a rifle
with a bayonet warranted protection under § 947.01(2). The
Wisconsin legislature added this provision to the statute in
2011 to clarify that a person does not violate the statute by
No. 22-1976 7

openly carrying “a firearm or a knife” “[u]nless other facts
and circumstances that indicate a criminal or malicious intent
on the part of the person apply.” § 947.01(2). We have previ-
ously recognized that § 947.01(2) “poses significant interpre-
tative problems that are best answered by the Supreme Court
of Wisconsin” given that it involves “issues of state and mu-
nicipal governance in matters of public safety.” Gibbs v. Lomas,
755 F.3d 529, 540 (7th Cir. 2014).
 As such, we pass no judgment on whether the disorderly
conduct statute actually justified Pierner-Lytge’s arrest. See id.
(noting that “it would be imprudent to base our decision on
speculation about the appropriate scope of [§ 947.01(2)]”). In-
stead, we decide this case on a narrower ground because even
assuming probable cause did not exist, Pierner-Lytge fails to
refute the officers’ qualified immunity defense. See Ashcroft v.
al-Kidd, 563 U.S. 731, 743 (2011) (“Qualified immunity gives
government officials breathing room to make reasonable but
mistaken judgments about open legal questions.”).
 B. Qualified Immunity
 “[O]fficers are entitled to qualified immunity under § 1983
unless (1) they violated a federal statutory or constitutional
right, and (2) the unlawfulness of their conduct was clearly
established at the time.” District of Columbia v. Wesby, 138 S.
Ct. 577, 589 (2018) (citation and internal quotation marks
omitted). “If either inquiry is answered in the negative, the de-
fendant official is entitled to summary judgment.” Gibbs, 755
F.3d at 537; see also Pearson v. Callahan, 555 U.S. 223, 236 (2009)
(concluding courts may “exercise their sound discretion in de-
ciding which of the two prongs of the qualified immunity
analysis should be addressed first”).
8 No. 22-1976

 Under prong two, Pierner-Lytge must demonstrate that it
was clearly established in April 2020 that probable cause to
arrest her for disorderly conduct did not exist. Siddique v.
Laliberte, 972 F.3d 898, 903 (7th Cir. 2020). To be clearly estab-
lished, “existing precedent must have placed the statutory or
constitutional question beyond debate.” Ashcroft, 563 U.S. at
741. “The precedent must be clear enough that every reason-
able official would interpret it to establish the particular rule
the plaintiff seeks to apply.” Wesby, 138 S. Ct. at 590. Pierner-
Lytge need not produce a case directly on point, but the “legal
principle [must] clearly prohibit the officer’s conduct in the
particular circumstances before him.” Id. “That sounds like a
high bar because it is—qualified immunity protects ‘all but
the plainly incompetent or those who knowingly violate the
law.’” Lopez v. Sheriff of Cook Cnty., 993 F.3d 981, 988 (7th Cir.
2021) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).
 In fact, the Supreme Court has “stressed that the specific-
ity of the rule is especially important in the Fourth Amend-
ment context.” Wesby, 138 S. Ct. at 590 (citation and internal
quotation marks omitted). When it comes to warrantless ar-
rests, “the rule must obviously resolve whether the circum-
stances with which [the particular officer] was con-
fronted … constitute[d] probable cause.” Id. (alterations in
original) (citation and internal quotation marks omitted). It
follows that “a body of relevant case law is usually necessary
to clearly establish the answer with respect to probable
cause.” Id. (citation and internal quotation marks omitted).
 In this respect, Pierner-Lytge comes up well short. She has
not “identified a single precedent—much less a controlling
case or robust consensus of cases—finding a Fourth Amend-
ment violation under similar circumstances.” Id. at 591
No. 22-1976 9

(citation and internal quotation marks omitted). Instead,
Pierner-Lytge relies on a 2009 Advisory Memorandum from
the Wisconsin Attorney General entitled, “The Interplay Be-
tween Article I, § 25 of the Wisconsin Constitution, The Open
Carry of Firearms and Wisconsin’s Disorderly Conduct Stat-
ute, Wis. Stat. § 947.01.” Memorandum from J.B. Van Hollen,
Att’y Gen., to Wis. Dist. Att’ys, Deputy Dist. Att’ys & Assis-
tant Dist. Att’ys (Apr. 20, 2009),
https://www.doj.state.wi.us/sites/default/files/2009-news/fi-
nal-open-carry-memo-2009.pdf.
 To start, this advisory memo “is not, of course, the sort of
definitive statement of the law by the courts that would make
a constitutional violation ‘clearly established.’” Gibbs, 755
F.3d at 541. Beyond that, nothing in the memo would prevent
a reasonable officer from deeming Pierner-Lytge’s conduct
“otherwise disorderly” under § 947.01(1). Recall that “other-
wise disorderly conduct” means conduct that is “similar in
kind to the conduct enumerated in the statute”2 and that has
“a tendency to cause or provoke a disturbance.” Gonzalez, 671
F.3d at 656. Pierner-Lytge openly carried a rifle with an af-
fixed bayonet and a handgun in a crowded public park where
she was reportedly watching families. Cf. Gibbs, 755 F.3d at
539 (concluding that “driving quickly down city streets, hold-
ing an unholstered gun … in view of other drivers” fits under
§ 947.01(1)). The multiple calls police received about her be-
havior further support the conclusion that a reasonable officer
could have believed her conduct was “otherwise disorderly.”
See Gonzalez, 671 F.3d at 656 (“Creating … public unease and

 2 Specifically, the statute includes conduct that is “violent, abusive,

indecent, profane, boisterous, [or] unreasonably loud.” § 947.01(1).
10 No. 22-1976

agitation is ordinarily sufficient to establish probable cause to
arrest for disorderly conduct ….”).
 Likewise, the memo does not resolve whether the “facts
and circumstances” present here suffice to evince “a criminal
or malicious intent” under § 947.01(2), which requires more
than openly carrying a firearm or knife. The memo explains
that “under certain circumstances, openly carrying a firearm
may contribute to a disorderly conduct charge,” Memoran-
dum from J.B. Van Hollen, ¶ 6 (emphasis added), and then
provides examples of such circumstances: a person carrying a
“rifle or shotgun through a crowded street while barking at a
passerby,” id., and “a person brandish[ing] a handgun in pub-
lic,” id. ¶ 7. One could argue that Pierner-Lytge’s conduct re-
sembles these scenarios. Combined with the information the
officers learned about Pierner-Lytge from the West Allis Po-
lice Department, a reasonable officer could have concluded
that Pierner-Lytge had a “criminal or malicious intent.” See
Gibbs, 755 F.3d at 541. Moreover, the memo does not speak to
whether a rifle with a bayonet constitutes “a firearm or a
knife,” § 947.01(2), in the first place. So, “[f]ar from clearly es-
tablishing that [her] conduct was not illegal, the memoran-
dum leaves open the distinct possibility that” § 947.01(2) did
not protect her. Gibbs, 755 F.3d at 541 (citation omitted).3
 In sum, while a reasonable officer should have known in
April 2020 that simply carrying a firearm or a knife in public
does not constitute disorderly conduct, much more is re-
quired to show that the legality of Pierner-Lytge’s conduct
was “beyond debate.” Wesby, 138 S. Ct. at 589 (citation

 3 Regardless, the memo predates the 2011 amendment by two years,

so its relevance to § 947.01(2) is “questionable” at best. Id. at 541 n.24.
No. 22-1976 11

omitted). To the extent the officers misjudged whether prob-
able cause existed to arrest Pierner-Lytge, it was a reasonable
decision given the state of the Wisconsin disorderly conduct
statute at the time. See Mwangangi v. Nielsen, 48 F.4th 816, 825
(7th Cir. 2022) (explaining that “an officer has arguable prob-
able cause,” and is thus entitled to qualified immunity, if “a
reasonable officer in the same circumstances and possessing
the same knowledge as the officer in question could have rea-
sonably believed that probable cause existed in light of well-
established law” (citation and internal quotation marks omit-
ted)); see also, e.g., Taylor v. Hughes, 26 F.4th 419, 433–34 (7th
Cir. 2022) (“Given the broad language employed by some Il-
linois cases and the lack of a contrary case directly on point,
we conclude that qualified immunity precludes liability … on
[the plaintiff’s] first false arrest claim.”). The district court
therefore did not err in granting Hobbs and Gladney qualified
immunity as to Pierner-Lytge’s Fourth Amendment claim.4

 III. Conclusion

 For the foregoing reasons, we AFFIRM.

 4 Pierner-Lytge also argues, in conclusory fashion, that this Court

should abolish the doctrine of qualified immunity, while acknowledging
that we are bound to follow Supreme Court precedent. As such, we need
not address her argument. See Borowski v. Bechelli, 772 F. App’x 338, 339
(7th Cir. 2019) (noting in response to an argument that conflicted with Su-
preme Court precedent that “we can do no more than acknowledge that
[the appellant] has preserved the argument”).