In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-2415

SUZANNE PARKER,

*Plaintiff-Appellant,*

*v.*

BROOKS LIFE SCIENCE, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 19-cv-04796 — **James R. Sweeney II**, *Judge.*

ARGUED JANUARY 12, 2022 — DECIDED JULY 14, 2022

Before FLAUM, EASTERBROOK, and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* Suzanne Parker sued her employer,
Brooks Life Science, Inc. ("Brooks"), under the Americans
with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, after
she was terminated from her position as a part-time recep-
tionist. She alleged that her termination was an act of retalia-
tion stemming from her request for a reasonable accommoda-
tion. The district court held that Parker did not produce evi-
dence that would allow a reasonable juror to infer a causal

link between her request and her termination, and it granted summary judgment in favor of Brooks. We affirm.

## I.    Background

Parker suffers from multiple sclerosis and sciatica and has received social security disability insurance benefits related to her diagnosis since 2005 or 2006. Brooks hired Parker as a temporary receptionist and administrative assistant in January 2017, and it hired her on a permanent basis about six months later. None of Parker's conditions interfered with her ability to perform the essential functions of her role at Brooks, which included letting people into the premises, greeting visitors, scheduling conference rooms, and ordering supplies. Parker was an hourly employee who worked part-time in the mornings, about twenty-five hours per week (usually from 8:00 AM to 1:00 PM). Another part-time receptionist, Pamela Johnson-Baird, covered the afternoons. Like Parker, Johnson-Baird is African-American and disabled.

During her time at Brooks, Parker had a number of different supervisors and received mixed feedback on her performance. For example, one of her early supervisors nominated her for an award and gave her a gift in appreciation for her hard work. However, in March 2018, approximately six months prior to Parker's termination, Brooks hired a new supervisor, Gillian Williams. Williams likewise praised Parker for her hard work and flexibility, but she also repeatedly coached Parker on her failure to abide by Brooks's paid time off ("PTO") policy.

The PTO policy required employees to request prior approval from their supervisors for planned time off and to enter the PTO hours they used in the company's payroll

software, Workday. Generally, employees did not have to use their accrued PTO if they arranged to switch shifts (*i.e.*, if the employees worked the same number of hours but at different times), but planned schedule changes did need to be approved by a supervisor in advance. For unplanned absences, Brooks permitted the use of PTO for "short-term illness or other absences that may not allow for advance manager notification." Williams only required her direct reports to request and enter PTO if a change to the schedule amounted to a "significant amount" of time, by which she meant a change of thirty minutes or more.

Williams's coaching concerning Parker's use of PTO started shortly after Williams did. First, in May 2018, Williams arranged a meeting with Parker and two human resources ("HR") representatives to review the PTO policy and ensure Parker's compliance moving forward. Williams considered this meeting to be a "verbal corrective action" and followed up after the meeting with an email to Parker titled "Today's Talking Point" to reiterate the need to create a set schedule for the front desk, receive prior approval for PTO, and enter all PTO into Workday.

A short while later, in mid-July, Parker emailed Williams regarding an upcoming vacation Parker had scheduled from October 12 through October 21, 2018. Williams approved the time off to the extent Parker could cover it with her PTO but denied Parker's request to take unpaid days off to cover the vacation. Williams offered to meet with Parker to discuss the matter further, but the parties dispute whether such a meeting actually took place. Brooks asserts that Williams did meet with Parker and that, during the meeting, Williams again instructed Parker to use Workday to enter her PTO. At this

stage, however, we must accept Parker's version of the story, which is that no such meeting ever took place.

The next month, Williams notified Parker and Johnson-Baird that another employee "w[ould] no longer be backup to the front desk." In light of that, Williams was "working to get a PRN (on-call) front desk receptionist that can help us out when needed." She asked Parker and Johnson-Baird, "when at all possible, please work together to cover each other's shifts." A Caucasian woman named Keri Lauman was hired as a temporary on-call receptionist and began her training period shortly thereafter.

Parker's alleged violations of Brooks's PTO policy all came to a head in early October 2018, when Williams returned from a week-long work trip to Arizona. On the morning of Monday, October 8, Parker emailed Williams to request time off to get treatment for pain she had been experiencing. She wrote, "I wanted to let you know that I have to leave at 12:30p today and [Johnson-Baird] is covering for me…. I also have to leave early tomorrow at 11:30a and [Johnson-Baird] is covering me as well." Neither party disputes that this request constitutes protected activity under the ADA. Williams responded:

> Today and tomorrow are fine. Please put in PTO for both of those. Although I am totally fine with the occasional change to the schedule for personal appointments, we really need to keep with the schedule and not alter it. I am not up to date on your available PTO, am I [*sic*] pretty sure that you will be short by the end of your [October 12 to October 21] vacation.

Later that day, other employees reported to Williams that while she had been in Arizona, Parker had altered her schedule several times and had enlisted other employees to cover for her. This was the first time Williams learned about these schedule alterations.

Two days later, Williams emailed Parker to ask whether she was going to be working that Friday, October 12. Although Williams had previously approved Parker to take PTO that day as part of her vacation, Williams wrote, "I know that you had mentioned maybe working it." Parker responded that she was not going to be in that Friday and that Keri Lauman, the temporary receptionist who was still in training, would take her shift that day. In the same email, Parker told Williams that (in addition to the vacation Parker had previously scheduled from October 12 to 21) she was going to need Monday, October 22 off, and Lauman had agreed to cover that day as well. Williams responded:

> All time off really needs to be prior approved before taking and making arrangements. I believe I have mentioned this a couple times. Also, we have discussed that you are exceeding your PTO and no additional time will be approved at this time. Let's chat about this please.

Parker and Williams met later that day. Williams told Parker that she had violated Brooks's PTO policy while Williams was in Arizona, had failed to stick to her set work schedule, and had altered her time without approval from Williams. Williams also reminded Parker that they had discussed these same issues previously. Parker acknowledged that they had indeed discussed the same issues in the past and agreed that she needed do a better job complying with the policy moving

forward. Williams understood Parker's statements to be admissions that she had violated Brooks's PTO policy by taking unapproved time off and altering her schedule without approval.

After this meeting, Williams emailed two HR employees, Asia Bartee and Heidi Kelley, summarizing her conversation with Parker and then writing:

> My recommendation is termination. Not only have I discussed this with [Parker] multiple times, but included HR. She will not follow policy and is not meeting the expectations clearly laid out for her. I have tried to coach her through this, I have tried to reinforce the expectations, and I spend more time managing [Parker] than I think is beneficial to the company.
>
> I understand that we will want to keep to the topic at hand, but these are not the only issues that I am having with her. Her quality of work is an issue and following through with deadlines. I end up taking the projects back and redoing them or reexplaining the project.

A few hours later, Bartee replied to the group:

> Heidi-
>
> I've been involved in these conversations with [Parker] and [Williams]. [Another HR employee] was as well. [Parker] not only disregarded policy, ignored what her supervisor instructed her to do, but did all of this while her supervisor was not physically here. I support termination at this time as well, however

> wanted to get your eyes on it if you had any con-
> cerns about it.

The next day, Kelley replied, "I am fine with the term. Please just make sure documentation is accurate/complete." Williams met with Parker later that day, October 11, 2018, and informed her that she was being terminated.

Williams did not give Parker a reason for her termination, though Parker notes that Brooks has since provided varying accounts of her departure from the company. After Parker applied for unemployment benefits, she was notified that in November 2018, Brooks's HR Director, David Brinkman, provided a statement to the Indiana Department of Workforce Development saying that Parker had voluntarily quit to accept other employment, which was not the case. In response to her complaint to the Equal Employment Opportunity Commission ("EEOC"), Brooks stated that its reason for terminating Parker was "her repeated failure to follow established policies for taking time off, which continued despite multiple reminders to Ms. Parker about the need to follow established policy." Throughout this lawsuit, Brooks has maintained that Parker's violations of its PTO policy motivated her termination.

Parker sued Brooks in December 2019, alleging claims of employment discrimination and retaliation on the basis of race and disability. The district court granted summary judgment in favor of Brooks on all claims. Parker now appeals that decision, challenging only the ruling on her ADA retaliation claim.

## II.    Discussion

We review the district court's grant of summary judgment de novo. *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 928 (7th Cir. 2020). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, courts are to view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

To survive a defendant's summary judgment motion, a plaintiff must make a "showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893–94 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). For a retaliation claim under the ADA, a plaintiff must submit evidence that (1) she engaged in protected activity, (2) her employer took an adverse action against her, and (3) there was a "'but for' causal connection between the two." *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020). In this case, only the third element, causation, is disputed.

In deciding whether there is a genuine issue of material fact as to whether a plaintiff's protected activity caused her termination, we must "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of

retaliation." *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016)) (applying *Ortiz*'s "evidence as a whole" standard to retaliation claims under Title VII and the Family Medical Leave Act); *Rowlands v. United Parcel Serv.–Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (applying *Ortiz* to a retaliation claim under the ADA). Circumstantial evidence of causation may include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Rowlands*, 901 F.3d at 802 (alteration in original) (quoting *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017)). On appeal, Parker argues that she presented sufficient evidence of suspicious timing and pretext to save her claim from summary judgment. We address each in turn.

### A. Suspicious Timing

First, Parker cites the suspicious timing of Brooks's decision to terminate her, which occurred just two days after her October 8 email in which she requested the accommodation to alter her schedule for pain treatment.[1] In a vacuum, this timing may appear suspicious; indeed, we have held that summary judgment is inappropriate where as much as a month's delay occurred between the protected activity and

---

[1] Though her termination itself occurred three days after her request for accommodation (she was terminated on October 11, 2018), Williams decided that she wanted to terminate Parker just two days after the October 8 request, as evidenced by Williams's email to the human resources employees on October 10 in which she recommended termination.

adverse employment action, where that suspicious timing was combined with additional evidence of pretext. *See, e.g., Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (one month between filing of complaints alleging discrimination and termination sufficient when combined with evidence that the policy the plaintiff allegedly violated did not apply and was not evenhandedly enforced).

Nonetheless, "[s]uspicious timing alone rarely establishes causation …." *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015). This is especially true where "a significant intervening event separat[es] [an employee's protected activity] from [her] discharge." *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011) (holding that the plaintiff's intervening violation of employee guidelines broke the inference of causation based on the five-day interval between his complaints and termination). As Brooks points out, other employees informed Williams that Parker had violated the company's PTO policy while Williams was in Arizona *after* Parker requested her accommodation but *before* Williams recommended Parker's termination. Far from supporting a causal connection between Parker's termination and her accommodation request, this timing of events supports Brooks's asserted link between Parker's violation of the PTO policy and her termination.

## B.  Evidence of Pretext

Next, Parker asserts that Brooks's stated reason for terminating her was pretextual. When evaluating a plaintiff's evidence of pretext, "it is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was … a lie." *Ineichen v.*

*Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) (internal quotation marks omitted). To meet this burden at summary judgment, a plaintiff "'must identify such weaknesses, implausibilities, inconsistencies, or contradictions' in the employer's asserted 'reasons that a reasonable person could find it unworthy of credence.'" *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 721 (7th Cir. 2021) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).[2]

If an employer's explanation for the challenged employment decision has been "shifting or inconsistent," this may be evidence of pretext. *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003). In an attempt to show such shifting or inconsistent explanations, Parker points to three emails that she interprets as evidence that "Williams praised Parker for doing the very same thing for which she was later terminated ([*i.e.,*] switching shifts without prior approval)."

Before delving into Parker's evidence of alleged pretext, it is helpful to address some of the nuances of Brooks's PTO policy and its position on Parker's conduct. First, we observe that

---

[2] In her appellate briefing, Parker repeatedly criticizes the district court for analyzing her evidence of pretext under what she labels as "the wrong standard." Specifically, in one sentence of its opinion, the district court wrote: "Parker's evidence of pretext … fails to indicate either that Brooks's proffered reason is not worthy of credence, or that *no* reasonable person could find it *credible*." (emphasis added). Although the correct standard is whether *a* reasonable person could find the defendant's proffered reason *not* credible, the district court recited the correct standard multiple times elsewhere in the opinion, and there is no reason to believe that the sentence Parker harps on is anything more than a scrivener's error. In any event, we review the district court's decision de novo and arrive at the same conclusion.

Brooks disputes Parker's framing—that Brooks terminated her solely because she "switch[ed] shifts without prior approval." Instead, Brooks maintains that it terminated Parker due to a variety of PTO policy violations between May and October 2018. At oral argument, Brooks further distinguished between switching shifts (where Parker worked the same number of hours per week but adjusted the timing of those hours with Johnson-Baird) and taking paid time off (where Parker found coverage and then worked fewer total hours). This distinction aligns with Williams's deposition testimony, where she explained that Parker "needed … a certain [number of hours] per week so that she was able to receive benefits," so Brooks "definitely did not [let Parker] go below those [hour requirements.]" On the other hand, Johnson-Baird "had more flexibility with her hours because she was not receiving any benefits." Williams further clarified that if an employee needed to work overtime, "then I had to get that prior approved." Williams also testified that she did not require employees to request and enter PTO if the change to the schedule was only a "few minutes." Specifically, Williams only required her employees to request and enter PTO for time off amounting to thirty minutes or more. Finally, as noted, Brooks's written PTO policy requires manager preapproval only in the event of *planned* absences, while acknowledging that "PTO may be applied to short-term illness or other absences that may not allow for advance manager notification."

With this background in mind, we turn to the three emails Parker relies on as evidence of Williams's allegedly shifting attitude toward PTO. We agree with the district court that no reasonable juror could read these emails in context as Parker wishes.

The first email exchange occurred on August 14, 2018. Parker emailed Williams: "I wanted to let you know that [Johnson-Baird] worked my shift yesterday because I wasn't feeling well. I didn't text you because I didn't want to bother you while you were on vacation." Williams responded, "Absolutely. I am always available when you guys need me, but happy you were able to work that out between you." Williams continued, "With that said, Friday would be an opportunity for you to makeup those hours and help support [Johnson-Baird] while she is out. This would also allow you to not have to use PTO for your missed hours yesterday." In reply, Parker explained at length that she has tried to cover for Johnson-Baird whenever possible but simply could not do so on the upcoming Friday. Parker points to this email as evidence that Williams (and Brooks) had no issues with Parker's practice of taking unapproved PTO time. But, significantly, this email indicates that it concerned an *unplanned* absence by Parker—which does not require manager preapproval, per the express terms of the PTO policy. This incident also reflects the distinction between switching shifts and the use of PTO that Brooks highlights on appeal. Considered in context, Williams's approval of Parker's actions in this instance is consistent with Brooks's PTO policy and her later disapproval when Parker failed to obtain prior authorization for *planned* absences.

Second, in an email dated September 18, 2018, with the subject line, "[Johnson-Baird]'s unexpected appointment," Parker informed Williams: "[Johnson-Baird] will be arriving late today and I'm staying until she gets here." In turn, Parker wrote, Johnson-Baird would come in fifteen minutes early to cover for Parker's appointment one week later. Williams responded, "Perfect. Thanks ladies." Parker asks us to read

Williams's response as thanking Parker for arranging to take PTO without prior approval, but the email cannot bear that interpretation. In this email, Williams only (1) thanked Parker for covering Johnson-Baird's *unplanned* ("unexpected") absence, and (2) approved Parker's request to leave fifteen minutes early one week later. Again, this is entirely consistent with Brooks's policy that a planned absence requires prior approval while an unplanned absence does not. Moreover, because the two receptionists were switching their hours, and the amount of time at issue was less than Williams's thirty-minute threshold, it makes sense that Williams did not mention the need to record PTO in Workday.

Third, Parker highlights Williams's August 30, 2018 email about front desk backup. In that note, Williams wrote:

> [Another employee] will no longer be backup to the front desk[,] …. [which] means that during your shift, you will want to stay at the front desk as much as possible.… As for coverage, when at all possible, please work together to cover each other's shifts. I am working to get a PRN (on-call) front desk receptionist that can help us out when needed. What this will mean is, we can call them to come in to cover last minute call ins (and vacation), but someone may need to stay until they can arrive. I know that you both do your best to help cover all these hours and I greatly appreciate it.

Parker wishes to view the phrase, "please work together to cover each other's shifts" in isolation, suggesting that Williams was encouraging Parker and Johnson-Baird to alter their schedules without prior approval. In context, however,

no reasonable juror could read that phrase to endorse deviations from the PTO policy. Instead, it is clearly focused on avoiding the need to find additional backup coverage whenever possible. In other words, Williams's email does not convey that it is permissible for Parker and Johnson-Baird to alter their hours or days off without telling Williams; reading the email as a whole, Williams is conveying her desire for each receptionist to cover the other's approved uses of PTO to avoid the need for an on-call receptionist to fill in. Like the other emails, nothing in this email is inconsistent with Brooks's or Williams's stated PTO policies.

We reiterate here that the relevant inquiry is not whether *Parker* could have understood Williams's emails as giving the receptionists license to alter their schedules without prior approval. *See Ineichen*, 410 F.3d at 961 (noting that "it is not the court's concern that an employer may … be too hard on its employee"). The question is whether *Williams* flip-flopped such that a reasonable juror could believe that approximately one month before Parker's termination—at the time these emails were sent—Williams encouraged Parker to alter her schedule without approval and then later terminated Parker for doing exactly that. Viewing the emails "as a whole," however, *see Ortiz*, 834 F.3d at 765, they cannot be understood as evidence of "weaknesses, implausibilities, inconsistencies, or contradictions in [Brooks's] asserted reason[] [such] that a reasonable person could find it unworthy of credence." *Marnocha*, 986 F.3d at 721 (internal quotation marks omitted).

Lastly, Parker points to Brooks's statement to the Indiana Department of Workforce Development that Parker "voluntarily quit to accept other employment" in response to her application for unemployment benefits. Parker brands this

statement as another inconsistency. Like the emails, however, the evidence does not support the inference Parker would like this Court to draw. This statement was made by Brooks's HR Director, David Brinkman, who worked in Brooks's corporate office in Massachusetts, and who indisputably was not involved in the decision to terminate Parker. Nor did Brinkman consult the decisionmakers before filling out the Indiana form at issue. While Brinkman's statement was clearly incorrect, it carries little evidentiary value. As we have explained, "[t]he analysis of pretext focuses only on what the *decisionmaker*, and not anyone else, sincerely believed." *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004) (emphasis added). We have held that even a former supervisor's inconsistent statement cannot create "[a]n inference of pretext" where "there is nothing in the record to suggest that [the supervisor] participated in the decision to terminate." *See Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876–77 (7th Cir. 2002). Because nothing in the record suggests that Brinkman played any role in Brooks's decision to terminate Parker, his incorrect statement to the Indiana Department of Workforce Development is irrelevant.

In addition to the dearth of evidence supporting a causal connection between Parker's request and her termination, at least two facts affirmatively suggest that there was no causal connection between these events. First, the contemporaneous emails sent by Williams and Bartee (a human resources employee) support Brooks's position that it fired Parker because she repeatedly violated the company's PTO policy and failed to respond to coaching on the issue. These emails—sent directly after Williams's October meeting with Parker—clearly articulated that Williams recommended termination because Parker "[wa]s not following the procedures for requesting

time off." Moreover, these emails contained no reference to Parker's request for an accommodation. Second, Williams's frustration with Parker's disregard for the PTO policy was unquestionably an issue in the months leading up to her termination, not a recent development. The record establishes that approximately five months earlier, Williams felt the problem was serious enough to warrant a sit-down meeting with Parker and HR representatives to review the policy and ensure her compliance moving forward.

Overall, our key inquiry is "whether the evidence would permit a reasonable factfinder to conclude that [Parker's] requests for accommodations caused the discharge." *Rowlands*, 901 F.3d at 801 (quoting *Ortiz*, 834 F.3d at 765) (alterations omitted). The district court correctly determined that evidence in this case would not allow a reasonable factfinder to so conclude. Accordingly, we affirm.

### III.    Conclusion

For the reasons explained above, we AFFIRM the district court's entry of summary judgment in favor of defendant-appellee Brooks.